*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

———— • ————

FRED BOWERMAN; JULIA BOWERMAN,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellees,*

v.

FIELD ASSET SERVICES, INC.; FIELD ASSET SERVICES, LLC,
*Defendants-Appellants.*

*On Appeal from the United States District Court for the Northern District of California,*
*Case No. 3:13-cv-00057-WHO · Honorable William H. Orrick*

## APPELLANTS' OPENING BRIEF

LITTLER MENDELSON, P.C.
ROBERT G. HULTENG
AURELIO J. PÉREZ
333 Bush Street, 34th Floor
San Francisco, California 94104
(415) 433-1940 Telephone

LITTLER MENDELSON, P.C.
BARRETT K. GREEN
2049 Century Park East, 5th Floor
Los Angeles, California 90067
(310) 553-0308 Telephone

CARLTON FIELDS JORDEN BURT, P.A.
FRANK G. BURT
BRIAN P. PERRYMAN
1025 Thomas Jefferson Street, NW
Suite 400 West
Washington, DC 20007
(202) 965-8100 Telephone

*Attorneys for Defendants-Appellants*
*Field Asset Services, Inc., and Field Asset Services, LLC*

 

# CORPORATE DISCLOSURE STATEMENT

Field Asset Services, LLC is wholly owned by Assurant Services LLC (now known as Xome Services, LLC), which in turn is wholly owned by Xome Holdings LLC, which in turn is wholly owned by WMIH Corp., a publicly held corporation. No publicly held corporation owns 10% or more of WMIH Corp.'s stock.

In 2011, Field Asset Services, Inc. was merged out of existence into FirstService Holdings, LLC.

*/s/ Frank G. Burt*
Frank G. Burt

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................. i

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ......................................................... 3

ISSUES PRESENTED ........................................................................... 3

STATEMENT OF THE CASE ................................................................. 4

    I.    Factual Background .................................................................. 4

        A.    FAS And The Independent Vendor Network .............. 4

                1.    FAS coordinates property preservation services, which vendors and their personnel perform .................................... 4

                2.    Arrangements with vendors are negotiable and vary widely .................................. 6

                3.    Government and client rules drive many job specifications ........................................ 9

        B.    Vendors Operate Their Own Property Preservation Businesses, Which Vary In Size And Kind .............................................................. 11

    II.    Procedural Background ........................................................ 15

        A.    Pre-Trial ..................................................................... 15

        B.    Trial And Post-Trial .................................................. 18

SUMMARY OF ARGUMENT ..................................................... 21

STANDARDS OF REVIEW ................................................... 24

ARGUMENT ......................................................................... 25

    I.    Summary Judgment Was Erroneous ................................... 25

        A.    The "Economic Realities" Test Articulated In *Borello* Supplies The Legal Framework ................ 25

        B.    The Right-To-Control Factor Raises Triable Issues ......................................................................... 28

                1.    The contracts ..................................................... 28

                        a.    Characterization of the relationship ..................................... 28

                        b.    Termination provisions ............................ 31

                        c.    Negotiable rates and terms ....................... 32

                        d.    Right to decline work ................................ 33

                2.    Manner and means ........................................... 34

                          a.    FAS does not control how work is performed ............................... 34

                        b.    FAS does not control who performs work ....................................... 40

                        c.    FAS does not control workers' schedules ........................................ 41

                        d.    There is conflicting evidence about training ...................................... 43

C.    The Secondary Factors Also Raise Triable Issues ........................................................... 44

    1.    Multiple factors were found to favor FAS ............................................................. 44

    2.    Other factors raise genuine factual disputes ......................................................... 45

        a.    Regular part of FAS's business ................. 45

        b.    Distinct occupation or business ............... 48

        c.    Exclusivity of relationship ....................... 51

        d.    Performance under principal's direction ................................................... 52

        e.    Other factors ............................................ 52

D.    The *Dynamex* ABC Test Does Not Apply .................... 52

    1.    *Dynamex* does not apply to joint-employer cases ................................................... 52

    2.    *Dynamex* does not govern plaintiffs' expense-reimbursement claims ......................... 55

E.    Even If The ABC Test Applies, Triable Issues Remain ............................................................ 57

II.    No Class Should Have Been Certified ................................. 60

A.    Adjudicating The Relevant Factors Requires Evaluating Disparate Experiences And Evidence .................................................................... 60

B.     No Common Evidence Exists To Prove
Overtime Hours Worked Or Reimbursable
Expenses Incurred ...................................................... 66

C.     Class Members Have Interests In
Individually Controlling Their Claims ....................... 71

III.     Expenses Incurred By A Claimant's Business,
Not The Claimant Personally, Are Not
Recoverable ............................................................... 72

CONCLUSION ........................................................................ 75

STATEMENT OF RELATED CASES ...................................... 76

CERTIFICATE OF COMPLIANCE
FOR CASE NO. 18-16303 ....................................................... 77

CERTIFICATE OF SERVICE .................................................. 78

# TABLE OF AUTHORITIES

**Federal Cases**                                                       **Page(s)**

*Alexander v. FedEx Ground Package Systems, Inc.,*
    765 F.3d 981 (9th Cir. 2014) ........................................... 42

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) ....................................................... 72

*California Trucking Association v. Su,*
    903 F.3d 953 (9th Cir. 2018) ........................................... 53

*In re Carter,*
    182 F.3d 1027 (9th Cir. 1999) ......................................... 55

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) ......................................................... 68

*Doe I v. Wal-Mart Stores, Inc.,*
    572 F.3d 677 (9th Cir. 2009) ..................................... 39, 42

*Doyle v. Chrysler Group, LLC,*
    663 F.App'x 576 (9th Cir. 2016) ...................................... 68

*Dunlap v. Liberty Natural Products, Inc.,*
    878 F.3d 794 (9th Cir. 2017) ........................................... 25

*Harris v. Vector Marketing Corp.,*
    753 F.Supp.2d 996 (N.D. Cal. 2010) ........................... 70, 71

*Hennighan v. Insphere Insurance Solutions, Inc.,*
    38 F.Supp.3d 1083 (N.D. Cal. 2014) ........................... 31, 42

*Jones v. Royal Administration Services, Inc.,*
    887 F.3d 443 (9th Cir. 2018) ................................. 39, 42, 44

*In re Kirkland,*
 915 F.2d 1236 (9th Cir. 1990) ........................................ 56

*Koike v. Starbucks Corp.,*
 378 F.App'x 659 (9th Cir. 2010) ..................................... 69

*Lambert v. Nutraceutical Corp.,*
 870 F.3d 1170 (9th Cir. 2017) ....................................... 25

*Lawson v. Grubhub, Inc.,*
 302 F.Supp.3d 1071 (N.D. Cal. 2018) ............................. 41

*Leason v. Rosart,*
 811 F.2d 1322 (9th Cir. 1987) ....................................... 29

*Leyva v. Medline Industries Inc.,*
 716 F.3d 510 (9th Cir. 2013) .................................... 67, 68

*Mazza v. American Honda Motor Co.,*
 666 F.3d 581 (9th Cir. 2012) .................................... 24, 25

*McLeod v. Field Asset Services, LLC,*
 No. 15-645, 2017 WL 338002
 (S.D. Ala. Jan. 30, 2017) ....................... 30, 35, 36, 39, 40

*Mitchell v. Franklin Bank, S.S.B.,*
 No. 05-1320, 2006 WL 4081216
 (D. Minn. Dec. 29, 2006) ............................................. 74

*Narayan v. EGL, Inc.,*
 285 F.R.D. 473 (N.D. Cal. 2012) ............................... 61, 66

*Narayan v. EGL, Inc.,*
 616 F.3d 895 (9th Cir. 2010) ............... 24, 27, 28, 33, 40, 44

*Norris-Wilson v. Delta-T Group, Inc.,*
 270 F.R.D. 596 (S.D. Cal. 2010) .................................... 71

*O'Connor v. Uber Technologies, Inc.*,
   904 F.3d 1087 (9th Cir. 2018) ........................................ 73

*Pearson v. PNC Bank, N.A.*,
   No. 15-1377, 2017 WL 1199125
   (N.D. Ohio Mar. 31, 2017) ...................................... 36, 41

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
   457 F.3d 963 (9th Cir. 2006) ........................................ 57

*Ruiz v. Affinity Logistics Corp.*,
   754 F.3d 1093 (9th Cir. 2014) ...................................... 32

*SIDA of Hawaii, Inc. v. NLRB*,
   512 F.2d 354 (9th Cir. 1975) ........................................ 37

*Soares v. Flowers Foods, Inc.*,
   320 F.R.D. 464 (N.D. Cal. 2017) ............................... 63, 72

*Valadez v. CSX Intermodal Terminals, Inc.*,
   298 F.Supp.3d 1254 (N.D. Cal. 2018) ........................... 38

*In re Wells Fargo Home Mortgage Overtime Pay Litigation*,
   571 F.3d 953 (9th Cir. 2009) ............................... 24, 25, 60

**State Cases**

*Ali v. U.S.A. Cab Ltd.*,
   176 Cal.App.4th 1333 (2009) ........................................ 63

*Arnold v. Mutual of Omaha Insurance Co.*,
   202 Cal.App.4th 580 (2011) ...................................... 48, 56

*Athol Daily News v. Board of Review of Division of
   Employment & Training*, 439 Mass. 171 (2003) ........................... 49

*Ayala v. Antelope Valley Newspapers, Inc.*,
   59 Cal.4th 522 (2014) ............................................. 29

*Beaumont-Jacques v. Farmers Group, Inc.*,
   217 Cal.App.4th 1138 (2013) .............................................. 31, 35, 42

*Curry v. Equilon Enterprises*,
   23 Cal.App.5th 289 (2018) .................... 45, 46, 48, 50, 54, 57, 58, 59

*Dynamex Operations West, Inc. v. Superior Court*,
   4 Cal.5th 903 (2018) ......................................... 53, 54, 55, 56, 58, 59

*Garcia v. Border Transportation Group, LLC*,
   28 Cal.App.5th 558 (2018) ........................................................ 53, 56

*Kim v. Sumitomo Bank*,
   17 Cal.App.4th 974 (1993) .............................................................. 51

*Linton v. Desoto Cab Co.*,
   15 Cal.App.5th 1208 (2017) ........................................................... 37

*Missions Insurance Co. v. Workers' Compensation
   Appeals Board*, 123 Cal.App.3d 211 (1981) ....... 29, 35, 41, 43, 44, 48

*Morales v. 22nd District Agricultural Association*,
   1 Cal.App.5th 504 (2016) .............................................................. 54

*Morgan v. Wet Seal, Inc.*,
   210 Cal.App.4th 1341 (2012) ......................................................... 71

*Nevada Department of Employment v. Reliable Health Care
   Services of Southern Nevada, Inc.*, 115 Nev. 253 (1999) ............... 47

*S.G. Borello & Sons v. Department of Industrial Relations*,
   48 Cal.3d 341 (1989).............................................................. 26, 27

*Sotelo v. MediaNews Group, Inc.*,
   207 Cal.App.4th 639 (2012) ................................................ 62, 63, 69

*Southwest Research Institute v. Unemployment Insurance Appeals Board*, 81 Cal.App.4th 705 (2000) ....................................37

*State Compensation Insurance Fund v. Brown*,
32 Cal.App.4th 188 (1995) ..................................................27, 40, 45

*Twenty-Nine Palms Enterprises v. Bardos*,
210 Cal.App.4th 1435 (2012) .........................................................72

*Varisco v. Gateway Science & Engineering, Inc.*,
166 Cal.App.4th 1099 (2008) .........................................................32

*Yellow Cab Cooperative v. Workers' Compensation Appeals Board*, 226 Cal.App.3d 1288 (1991)..................................51

**Federal Statutes and Rules**

Fed.R.Civ.P. 23 ................................................................................60, 72

**State Statutes and Rules**

Cal. Labor Code § 2802....................................................................70, 73

Cal. Labor Code § 3353....................................................................25, 28

Cal. Code Regs., tit. 8, § 11050 .....................................................56, 57

Cal. Code Regs., tit. 8, § 11170 ............................................................57

**Other Authorities**

Restatement (Second) of Agency § 220 (1958)........................................45

## INTRODUCTION

This appeal involves purported employment misclassification. Defendants-appellants Field Asset Services, Inc. and Field Asset Services, LLC (collectively, "FAS") are in the business of coordinating property preservation services for the residential mortgage industry. FAS does not itself perform preservation services, but contracts with a network of independent vendors which supply the labor and equipment. The vendors are often substantially-sized businesses in their own right. FAS acts as an intermediary between its mortgage-servicing clients and this independent network. Below, the District Court certified a class of owners of these vendors under Fed.R.Civ.P. 23(b)(3). They sued on the theory that, under California law, they are all FAS employees, not independent contractors, and were misclassified as such.

As this Court has cautioned, it is only the "rare case" where the relevant factors – a right to control and other indicia – will point decisively to employee status. Undaunted, the District Court entered partial summary judgment for the class on that issue. That ruling was literally unprecedented. FAS is unaware of any other California court that has ruled as a matter of law that a class of independent vendors

which includes large-business owners are all, in fact, employees. As the District Court itself acknowledged, "this case is pushing envelopes and raising a lot of issues that aren't well-developed." ER359. Indeed, the ruling below conflicts with a near-contemporaneous summary judgment ruling by another federal court that FAS is *not* its vendor's employer.

Class certification was equally inappropriate. Plaintiffs cannot prove the relevant factors without examining individual class members' experiences. Although it originally denied certification on exactly that basis, the District Court subsequently certified a class defined to include only those persons who worked for FAS more than 70 percent of their time. The percentage limitation, the District Court reasoned, provides a basis for inferring that all class members economically "depended" on FAS and were thus subject to FAS's *de facto* control. This sort of reasoning is facile. Because it does not account for the duration of any particular relationship with FAS or any class member's unique business position, leverage, or preferences, the limitation is not probative of whether any member "depended" on, or was controlled by, FAS. Nor does the limitation resolve countless other factual variations that exist across the class membership.

## STATEMENT OF JURISDICTION

The District Court had original jurisdiction under 28 U.S.C. § 1332(d). The members of the certified class are citizens of states different from FAS. Furthermore, the matter in controversy exceeds the sum or value of $5 million, exclusive of interest and costs.

This Court has appellate jurisdiction under 28 U.S.C. § 1291. The District Court entered an order on June 13, 2018 stating that a judgment would be entered in favor of ten unnamed class members: Jake Bess, Janeen Cloud, Matthew Cohick, Linda Dunham, Kenneth Freeborn, Amy Gowan, John Gowan, Matt Jaques, Kim Miller, and Anthony Yager (collectively, "Claimants"). ER14. On June 29, 2018, the District Court directed entry of judgment in favor of the Claimants, but not all other class members, under Fed.R.Civ.P. 54(b). ER10. Final judgment in the Claimants' favor was entered that day. ER6-7. FAS filed a timely notice of appeal on July 12, 2018. ER167-68.

## ISSUES PRESENTED

The issues presented for the Court's review are:

1. Whether the District Court erred in holding on summary judgment that the Claimants are FAS employees under California law.

2. Whether the District Court erred in certifying, and later refusing to decertify, the class claims.

3. Whether the District Court erred in holding that certain Claimants may recover under Cal. Labor Code § 2802(a) expenses incurred by the Claimants' separately-incorporated businesses, rather than the Claimants personally.

## STATEMENT OF THE CASE

### I. Factual Background.

#### A. FAS And The Independent Vendor Network.

##### 1. FAS coordinates property preservation services, which vendors and their personnel perform.

FAS coordinates pre-foreclosure, real estate-owned property preservation services for the residential mortgage industry. ER408. Its clients include private and government mortgage holders. *Id.* FAS is one of several national property preservation companies, each of which may serve hundreds of mortgage-servicing clients. ER408; 412. Those clients have in turn adopted specifications designed to comply with government-mandated regulations. ER408; 412.

FAS does not itself provide property preservation services; the actual work is performed by a network of independent businesses with

whom FAS contracts. ER408. These businesses are "vendors" to FAS, the "vendee." Vendors, which range from sole proprietors to substantially-sized corporations, supply their own equipment, labor, and skills. *Id.* FAS is an intermediary between its clients and the vendors, matching clients' needs with vendors that can meet those needs. *Id.* It negotiates with clients and vendors over prices, geographic coverage areas, and service requirements. *Id.*

Although FAS relays client specifications to vendors, FAS does not control how vendors meet those specifications, *e.g.*, the techniques to be followed, what tools and equipment to use, whether to engage assistants, and so forth. ER408-09. One class member, for example, attested that "FAS does not tell us what tools and equipment we are to use in completing the work." ER371. Another testified that he and his assistants "could choose when to and how to do their work orders as they saw fit." ER666-69.

Upon accepting a work order, vendors have a 72-hour window in which to complete the job. ER411. That window can be, and often is, extended by negotiation. ER370; 386. Vendors otherwise maintain complete discretion setting their workers' schedules, including arrival

and departure times, and breaks.  ER370; 455; 786; 796-98.  FAS does not track the time vendors spend working.  ER21; 455-56.

FAS takes steps to verify that vendors have actually completed the work.  ER409.  Because FAS is located in Texas, verification primarily occurs through inspection of photographs that vendors transmit to FAS.  *Id.*  FAS also employs a limited number of "Field Quality Control Specialists" whose duties include spot-checking properties.  *Id.*  Site visits are performed randomly and involve only "a small percentage of volume."  ER822.  FAS's concern is that the work is done properly and timely – the result – not how it is done or who did it.  ER409; 573; 577.

### 2. Arrangements with vendors are negotiable and vary widely.

Vendors contract with FAS through a variety of written agreements, often called "Vendor Qualification Packets" or "VQPs," which set out the terms of the relationship.  ER409; 457-59; 513.  VQPs have varied over time in material ways, including differing provisions regarding contract termination (some VQPs do not contain termination provisions, others provide that the contract can be terminated at any time, some allow termination for breach by either party, and still others

6

contain notice requirements); independent contractor acknowledgments (some expressly acknowledge the independent contractorship, others do not); background screening; nonexclusivity; and enumeration of job specifications. ER457-59.

Although FAS has used templates, each VQP's terms are negotiable. ER409. As the District Court found, vendors "choose which services they will provide," ER74, negotiating with FAS to add or eliminate the services they will offer. ER410. "Property preservation" includes code compliance, evictions, exterminations, winterization, inspections, plumbing, roofing, hazardous-materials transportation, board-ups, re-keying, debris removal, tree-trimming, pressure-washing, lawn maintenance, rehabilitation, lockbox, padlock/hasp installation, gutter cleaning/repair, pool maintenance, refrigerator/freezer cleaning, handrail installation/repair, sump-pump, window and door repair, water/gas/sewer line maintenance, and utilities data. ER409-10.

Vendors also negotiate regarding the geographic areas in which they will provide services. ER410. Some agree to provide services only within a few zip codes. *Id.* Others provide services across an entire state or in multiple states. ER410; 674-75.

Vendors negotiate with FAS regarding how many properties they are willing to service, *i.e.*, a "cap." ER410. When a vendor provides different types of services, it will establish different caps. *Id.* Vendors may negotiate to change their caps based on capacity. *Id.*

Vendors are paid by the job, not the hour. ER110. They negotiate in advance with FAS the prices for their services. ER410. It is common for FAS and vendors to arrive at set prices for batches of services that regularly recur. *Id.* FAS typically offers base prices for these services and vendors then accept, reject, or counter the offer. *See, e.g.*, ER380-81; 410-11; 530; 560-61; 586-87; 650; 653; 670; 707-09; 781-84. Thereafter, vendors can, and do, negotiate price adjustments. ER411; 676-77. One class member attested, for example, that "base prices are negotiable" and his business "has never been stuck with the prices in any way." ER370. He offered multiple examples of successful negotiation. ER370-71. Some vendors seek to renegotiate prices less than once a year; others do so on a quarterly basis or more frequently. ER411. One class member negotiated prices "daily." ER676.

Some services are not standardized and require "bid" pricing. ER411. For example, the cost to repair a roof can vary depending on

multiple factors, including the type of roof, its pitch, and the amount and type of damage. *Id.* Under bid pricing the vendor determines the work to be done, and offers a bid to FAS. *Id.*

Vendors can, and do, decline to accept work offered by FAS for a variety of reasons or no reason at all. *Id.* FAS does not require vendors to assume more work, nor does it punish vendors for not doing so. ER180; 370; 582. One class member attested that he has "always been free to determine the types of jobs, and the amount of jobs, my business accepts from FAS." ER370. Likewise, FAS does not require vendors to accept jobs in geographic areas where they have not agreed to work. ER370; 411; 582.

### 3. Government and client rules drive many job specifications.

As noted, FAS clients' specifications are largely designed to comply with government-mandated regulations. For example, Fannie Mae, under the auspices of its Federal Housing Finance Agency conservatorship, publishes a "Property Preservation Matrix and Reference Guide" which Fannie Mae-approved servicers must follow. ER408; 414-33. Similarly, the United States Department of Housing and Urban Development ("HUD") has its own preservation

requirements for properties securing mortgages insured by the Federal Housing Administration. ER409; 435-50. FAS communicates these client specifications and government rules to vendors in VQPs, work orders, or by other means. ER72; 74; 574.

Both Fannie Mae and HUD require property preservation providers to adhere to extensive guidelines pertaining to the completion and documentation of a range of services, including: securing properties (lock changes, boarding, and inspection/repair of windows and doors), maintenance of pool/spa; lawn maintenance (standards for grass cutting and clipping, edging, and snow removal), winterization, roof replacement and repairs, utility and sump-pump operations, debris removal, and water/gas/sewage line maintenance. *See generally* ER414-33; 435-50. These guidelines also provide timetables corresponding to tasks, along with other detailed procedures. *See generally id*.

FAS is required to maintain a chain of documentation verifying that vendors meet the guidelines. Fannie Mae requires photographs capturing a "complete view" and "only clear, focused, color photos that pertain to each applicable bid line item," at a dimension of 3½" to 5", accompanied by a "label with a description," bearing a date-stamp and,

where damages are found, "interior and exterior photos are required to detail current property conditions."  ER414.  HUD similarly requires that tasks be "documented to include before and after pictures using digital photography" that are "dated and labeled."  ER441.

## B. Vendors Operate Their Own Property Preservation Businesses, Which Vary In Size And Kind.

No two vendors are alike; some are not even remotely comparable. Vendors vary materially in corporate form, company size, revenue, quantity and quality of relationships with clients, capabilities and assets, licensing, marketing and branding, and other respects.

Many vendors are registered corporations or limited liability companies, or take other corporate forms.  This is true for several Claimants' businesses.  ER162; 369; 628-29; 695; 792.  Others are sole proprietorships.  ER393; 520; 605; 780.

Vendors are free to, and do, assign work to whichever assistants they see fit to use.  ER411; 654; 718-19.  Below, it was "undisputed that the vendors make the ultimate decision to hire workers."  ER111.  Many hire employees (including administrative and supervisory employees) or subcontractors to complete the work.  ER411.  Exactly whom vendors engage, or how they engage them, is unknown to FAS.  ER412; 455;

816-17.  Most vendors, however, have provided FAS with Employer Identification Numbers, indicating that the vendors pay employment taxes for their own employees.  ER411.

Some vendors are relatively small operations; some are quite large.  At one end of the spectrum, one Claimant performed the work by herself and with family members.  ER594-96.  Toward the other end, another Claimant hired numerous field and administrative workers – up to 30 employees and 30 subcontractors at a time – who performed work even in the Claimant's absence.  ER697-702; 710-11.  Notably, that same Claimant and his business (Monster Mowers) were themselves sued for misclassifying employees in violation of California law.  ER823-46.  Other vendors are even larger – one class member had as many as 65 employees at one time.  ER162; 673.

In the middle are vendors which retained stables of personnel: one class member hired up to 20 workers, ER813-14, several Claimants each hired between eight and twelve workers, ER628-29; 795, another hired five subcontractors, ER396-97, and one had six assistants, ER518.  One Claimant's business engaged subcontractors as a "regular thing," and those subcontractors in turn selected their own assistants.  ER918-

20. The named plaintiff's business, which hired up to seven assistants, ER785, at least some of which received a Form W-2, ER645, even had an employee handbook. ER543-44.

Vendors range widely in their revenues. Some vendors generate over $1 million annually; others generate less than $30,000. ER514. It was undisputed "that opportunity for profit exists." ER111. For example, one Claimant's business generated up to $1.4 million in 2010 and $768,000 in 2012. ER514. Another Claimant generated $717,000 in 2010 and $538,000 in 2011. *Id.* By comparison, a third Claimant generated $74,000, $79,000, and $22,000 in 2010, 2011, and 2012, respectively. *Id.* Amounts attributable to FAS also vary. One class member attested that, in some months, half of his revenue was from FAS; in other months, it accounted for 95 percent. ER374-75.

Vendors are free to, and do, maintain business relationships with FAS competitors and other clients. FAS has no way of knowing who else vendors work with. ER411. Evidence from the Claimants and other class members, however, reveals that many provided property preservation or other services to other clients – including real-estate agents, homeowners, and FAS competitors – before, during, and after

their relationships with FAS. *See, e.g.*, ER366-67; 369; 374-76; 394-95; 411-12; 585; 589-602; 630-34; 651-52; 657-58; 684-85; 712-13; 793-94. Vendors also have worked directly for FAS clients, including Fannie Mae and banks. ER412.

Vendors make substantial investments in and grow their own businesses. They are responsible for all associated costs, *id.*, including acquiring tools and equipment like computers, printers, cameras, telephones, vehicles, office space, furniture, hardware, and other assets. *See, e.g.*, ER74; 372; 635; 639-40; 659-61; 680-83; 703-06; 789; 799-806; 809-12; 815. One Claimant's business owned a fleet of thirteen trucks, ER705; other class members had six trucks, ER649, and ten trucks and a company car, ER664-65. Vendors' self-investments can be quite significant, as illustrated by the fact that Claimants each sought, and were awarded, tens of thousands of dollars of expenses. ER56.

Vendors market themselves through a variety of methods, including websites, online advertising, business cards, logos, uniforms and branded apparel, vehicle decals, flyers, and other promotional materials. This is true for many Claimants and class members. *See, e.g.*, ER162; 372; 635; 638; 649; 662-63; 688-90; 696; 717; 787; 812.

Monster Mowers, for example, invested heavily in Monster Mowers-branded apparel. ER412; 452.

Many vendors hold occupational licenses beyond business permits, including general contractors licenses. This is true of several Claimants. ER848; 917. FAS is not a licensed contractor. ER820.

## II.  Procedural Background.

### A.  Pre-Trial.

The named plaintiffs – a married couple named Fred Bowerman and Julia Bowerman née Magdaleno – sued FAS in January 2013, alleging in their operative complaint causes of action for: (i) breach of contract; (ii) breach of the covenant of good faith and fair dealing; (iii) willful misclassification, Cal. Labor Code §§ 226.8, 2753; (iv) failure to pay overtime compensation, Cal. Labor Code §§ 510, 1194, 1198; (v) failure to pay wages due and owing, Cal. Labor Code § 200 *et seq.*; (vi) failure to indemnify unreimbursed business expenses, Cal. Labor Code § 2802; (vii) violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and (viii) violations of the Private Attorney General Act, Cal. Labor Code § 2699 *et seq.*  *See* ER978-98.

After denying an initial motion for class certification, ER166, on plaintiffs' renewed motion, in March 2015 the District Court certified the following class under Fed.R.Civ.P. 23(b)(3):

> All persons who at any time from January 7, 2009 up to and through the time of judgment (the "Class Period") (1) were designated by FAS as independent contractors; (2) personally performed property preservation work in California pursuant to FAS work orders; and (3) while working for FAS during the Class Period, did not work for any other entity more than 30 percent of that time. The class excludes persons who primarily performed rehabilitation or remodel work for FAS.

ER120. The "30 percent" threshold was plucked from thin air – there is nothing special in law or fact about that number. So certified, the class is limited to 156 individuals. ER15-16; 173-77.

Plaintiffs thereafter moved for partial summary judgment as to their status as employees. FAS cross-moved as to two unnamed class members, Matthew Cohick (one of the Claimants) and Eric Ackel, and one of the named plaintiffs (Magdaleno). At first acknowledging, but then inexplicably glossing over, variations across the class membership, in March 2017 the District Court denied FAS's first motion for

decertification and granted partial summary judgment for the class on the employee-status issue.  ER118.

Applying the "economic realities" test used by California courts since at least 1989, the District Court found that FAS possessed a right to control the vendors, the test's "principal" factor.  ER101-06. Regarding the test's "secondary" factors, the District Court stated that, if it "ignored the right to control analysis, and focused solely on the secondary factors," then it "would not grant summary judgment." ER106.  Some of those factors "favor viewing the vendors as independent contractors, and some as employees."  ER106.  But the fact that the right-to-control factor was "pre-eminent," the District Court reasoned, sufficed to grant summary judgment.  *Id.*  For the same reasons, the District Court denied FAS's cross-motion as to Cohick and Ackel.  ER118.  It did, however, grant summary judgment as to Magdaleno, who did not fall within the class definition. *Id.*

In ruling, the District Court observed that plaintiffs "predominantly rely on driver cases [like *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093 (9th Cir. 2014), and *Alexander v. FedEx Ground Package Systems, Inc.*, 765 F.3d 981 (9th Cir. 2014)] to support their

argument." ER98-99.  The District Court recognized that, although "the driver cases present the most recent authority on the issue of worker classification, the nature of the vendors' work here limits the persuasiveness of those cases."  ER100.  Unlike the "driver cases," vendors "select and perform a wide variety of tasks" and, "[b]ecause the level of skill varies depending on the task, the specifications, training, and level of supervision all vary as well."  *Id.*  The District Court nonetheless tethered much of its reasoning to these same inapposite "driver cases," heavily quoting from and citing to them.

## B.    Trial And Post-Trial.

The District Court held an eight-day bellwether jury trial in July 2017 to determine damages for the ten Claimants and the remaining named plaintiff, Bowerman.  ER1027-31.  Plaintiffs' counsel handpicked each of these individuals.  The jury awarded these select class members damages for overtime wages and business expenses.  ER181-203.

The bellwether trial laid bare many of the problems of collective proof in this case.  All who testified relied on their unaided memories as the primary or sole evidence of their work schedules.  *See, e.g.*, ER222-225; 239-46; 257-62; 265-69; 287-89; 300-01; 312-14; 322-28; 338; 346-

50.  None offered time-entry data or other contemporaneous records of hours worked.  The named plaintiff did not have "any documents reflecting his hours."  ER345-46.

None of those testifying had complete and accurate records of their business expenses.  The named plaintiff, for example, could not distinguish between mileage for business and personal purposes.  ER351.  Others did not have any records at all.  ER335.  It was impossible for one Claimant to estimate how many of his expenses were attributable to work for FAS versus work for FAS competitors.  ER275-76.  And most could not determine whether the expenses were for materials used by themselves or employees of their preservation business.  *See, e.g.*, ER219-20; 231-38; 251-52; 210-13; 263; 282-85; 295-97; 303-04; 315-21; 329-37; 343-44.

Five of the Claimants' separately-incorporated businesses incurred expenses; these Claimants did not themselves personally incur these expenses.  ER61; 63.  Post-verdict, the District Court nonetheless denied FAS's motion for judgment as a matter of law under Fed.R.Civ.P 50(b) on this issue, holding that "FAS should not be permitted to avoid liability for its employees' necessary expenditures on its behalf by

claiming that the vendor's business entity, not the vendor-owner, incurred FAS's business expenses." ER62.

In January 2018, the District Court held a bench trial on the § 17200 claims. ER1034. It entered findings of fact and conclusions of law in May 2018, again finding for the Claimants. ER58.

The claims and defenses having been fully adjudicated as to the Claimants, in June 2018, the District Court entered an order directing entry of judgment in the Claimants' favor under Fed.R.Civ.P. 54(b). ER10. Final judgment for the Claimants was entered that day. ER6-7. No final judgment has been entered for any other class members. This appeal followed. ER167-68.

Thereafter, in August 2018, the District Court denied FAS's second motion for decertification. ER5. Acknowledging that any class trial will be "onerous," "cumbersome," and "far messier than promised by plaintiffs' counsel," the District Court nonetheless elected to proceed without *any* common evidence of overtime hours worked or reimbursable expenses incurred, where plaintiff-by-plaintiff testimony and credibility determinations will be "necessary." ER4-5.

## SUMMARY OF ARGUMENT

### I.

A.     In concluding that FAS employed the Claimants and other class members, the District Court failed to construe the record in FAS's favor, usurping the jury's role by weighing competing evidence and choosing between competing inferences.  This Court should reverse.

The District Court applied the "right-to-control" and "secondary" factors of the "economic realities" test set forth in *S.G. Borello & Sons v. Department of Industrial Relations*, 48 Cal.3d 341 (1989).  Applying those same factors, however, a jury could reasonably find that the Claimants were independent contractors.

Regarding the right-to-control factor, the evidence showed that: (i) the parties characterized the relationship as an independent contractorship; (ii) contract terms and prices were negotiable; (iii) if they existed at all, termination provisions were often mutual; (iv) job specifications were set by FAS's clients and government agencies, and were not devised by FAS; and (v) vendors had the right to, and did, control the manner and means of work, including who performed the work and how it was performed.  Regarding the secondary factors, the

21

District Court explained that it would not have granted summary judgment but for its (erroneous) evaluation of the right-to-control factor. Indeed, multiple secondary factors militate against employee status. Conflicting evidence exists as to other factors. The District Court simply downplayed or disbelieved FAS's evidence.

B.    Just prior to the entry of final judgment for the Claimants, the California Supreme Court announced a new three-part legal test for misclassification claims based on California wage orders. The so-called "ABC" test debuted in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal.5th 903 (2018). *Borello*, not *Dynamex*, still applies. The reasons for adopting the ABC test are inapplicable in the joint-employer context, and the Claimants are more employees of their preservation businesses than they are of FAS itself. Moreover, *Dynamex* was clear that the ABC test applies only if the claims are based on wage orders. The expense-reimbursement claims here are not properly based on any wage order.

Even if the ABC test applies, a jury could continue to reasonably find for FAS. Regarding the "A" element, again, vendors were free from FAS's control and direction, both under the parties' contracts and in fact. Regarding the "B" element, vendors performed work outside the

usual course of FAS's business. FAS is in the business of *coordinating* property preservation services; vendors are in the distinctly different business of actually *performing* those services. Regarding the "C" element, vendors operated independently-established businesses. Vendors took steps to establish and promote their businesses through such things as incorporation, occupational licensing, and marketing.

## II.

The District Court erred in certifying, and refusing to decertify, class claims under Rule 23(b)(3). For the same reasons that summary judgment was erroneous – there is widespread evidentiary variation on the relevant factors – any questions common to class members do not predominate over questions affecting only individual members. This procedure-related error follows *a fortiori* from the District Court's merits-related errors. Furthermore, the *conceded* need for plaintiff-by-plaintiff testimony regarding entitlement to overtime compensation and expense reimbursements raises additional predominance concerns.

## III.

Cal. Labor Code § 2802(a) requires an employer to indemnify its "employee" for "all necessary expenditures." The Claimants are the

23

employees here, not their separately-incorporated businesses. Those Claimants who did not personally incur expenses should not be permitted to recover them on behalf of their non-employee businesses.

## STANDARDS OF REVIEW

This Court reviews *de novo* grants of summary judgment under Fed.R.Civ.P. 56. *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010). In doing so, the Court determines, viewing the evidence in the light most favorable to the nonmovant, whether genuine issues of material fact exist and whether the district court correctly applied the substantive law. *Id.* Summary judgment is inappropriate if a reasonable jury viewing the record could find by a preponderance of the evidence that the nonmovant is entitled to a favorable verdict. *Id.* The nonmovant's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Id.*

"A district court's decision to certify a class under Rule 23 is reviewed for abuse of discretion." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009). That discretion nonetheless must remain "within the framework of Rule 23." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). Abuse exists

in three circumstances: (i) reliance on improper factors, (ii) omission of a substantial factor, or (iii) a clear error in weighing the correct mix of factors. *Wells Fargo*, 571 F.3d at 957. When a district court's application of facts to law requires reference to values that animate legal principles, that application is reviewed *de novo*. *Mazza*, 666 F.3d at 588. The party seeking to maintain class certification at all times bears the burden of demonstrating that Rule 23's conditions are met. *See Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017).

Denial of a renewed motion for judgment under Fed.R.Civ.P. 50(b) as a matter of law is reviewed *de novo*. *Dunlap v. Liberty Natural Prods., Inc.*, 878 F.3d 794, 797 (9th Cir. 2017).

## ARGUMENT

### I. Summary Judgment Was Erroneous.

#### A. The "Economic Realities" Test Articulated In *Borello* Supplies The Legal Framework.

Under California law, a worker qualifies as an independent contractor rather than an employee if he "renders service" for "a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished." Cal. Labor Code § 3353. For decades, California courts

have distinguished between independent contractors and employees by applying the multi-factor *Borello* "economic realities" test. In ruling on summary judgment, the District Court also applied that test.

Under *Borello*, the "principal test" of employee status is whether the person to whom service is rendered has the right to control the "manner and means" of accomplishing the result desired. 48 Cal.3d at 350. Courts also apply several "secondary" indicia "derived principally from the Restatement Second of Agency." *Id.* at 351.

> These include (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Id.*

*Borello* also cited related factors used in other jurisdictions.

These include: (1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business.

*Narayan*, 616 F.3d at 900-01.

The *Borello* factors are not applied "mechanically" as separate tests but are "intertwined," their relative weight depending upon particular combinations. *Id.* at 901. Courts must consider all "incidents of the relationship," understanding that no single factor is decisive. *Id.*

Indeed, a central theme of *Borello* was to *deemphasize* the right-to-control factor. *Borello* recognized that "'control of work details' is not necessarily the decisive test for independent contractorship," 48 Cal.3d at 351 n.5, and that the "nature of the work, and the overall arrangement between the parties, must be examined" in addition to control. *Id.* at 353. "Right of control retains significance" post-*Borello*, "*but is no longer determinative.*" *State Comp. Ins. Fund v. Brown*, 32 Cal.App.4th 188, 202 (1995) (emphasis added).

**B.    The Right-To-Control Factor Raises Triable Issues.**

It is only the "rare case" where the *Borello* factors will point with unanimity in one direction.  *Narayan*, 616 F.3d at 901.  This is not that "rare case."  If anything, the factors point *away* from employee status, not *towards* it.  That is especially true of the right-to-control factor.  The parties' written contracts – the VQPs – characterize the relationship as vendor-vendee or independent contractor (not employer-employee), feature negotiable rates and terms and, if they include termination provisions at all, often permit mutual termination.   FAS does not control who performs work, or how or when work is performed.   FAS merely requires adherence to government-mandated rules within a general timeframe for completion, asking vendors to verify their work.  That is consistent with controlling the "result of work," not "the means by which such result is accomplished."  Cal. Labor Code § 3353.

**1.    The contracts.**

**a.    Characterization of the relationship.**

The *Borello* test begins by examining the parties' written contracts, if any.  Although "the rights spelled out in a contract may not be conclusive if other evidence demonstrates a practical allocation of

rights at odds with the written terms," any "written contract is a necessary starting point." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal.4th 522, 535 (2014). "One must consider the contract," not just "the parties' course of conduct." *Id.* Any written agreement "setting forth the details" of the relationship is, at minimum, "a significant factor for consideration." *Missions Ins. Co. v. Workers' Comp. Appeals Bd.*, 123 Cal.App.3d 211, 226 (1981).

Although the VQPs vary, they uniformly characterize the parties' relationship as vendor-vendee. That characterization is radically inconsistent with the District Court's view of the parties as employer-employee. *See Leason v. Rosart*, 811 F.2d 1322, 1325 (9th Cir. 1987) ("The parties dealt with each other not as agent and principal, but rather as vendor and vendee."). Furthermore, some VQPs expressly characterize the relationship as an independent contractorship. *See, e.g.*, ER73; 458; 504. Other VQPs describe the "Insurance Coverage Requirements for Independent Contractors," ER486, also evidencing the parties' understandings. And several Claimants acknowledged their contractual intent to create independent contractorships. *See, e.g.*, ER533; 641; 691-92. One class member even specifically "intended to

create an independent contractor relationship" and, during his nine-year relationship with FAS, he "always understood that to be the nature of our relationship." ER370.

The District Court did not give these characterizations the significant consideration they merit. In evaluating the right-to-control factor, it barely considered the characterizations at all, waving them away as "not dispositive." ER104.

Although the parties' characterization of the relationship is "not dispositive," that does not mean the District Court was correct in assigning it no weight at all. In granting summary judgment for FAS on the question of whether a property preservation vendor was an FAS employee, another federal court (applying Alabama law) placed significant weight on the VQP's characterization of the relationship as not employer-employee. *See McLeod v. Field Asset Servs., LLC*, No. 15-645, 2017 WL 338002, at *4-5 (S.D. Ala. Jan. 30, 2017). An interpretation "essentially 'reading in' a different relationship between the parties other than that which is *expressly* spelled out in the relevant contracts" is "unpersuasive." *Id.* at *5. A jury could be equally unpersuaded here.

### b.     Termination provisions.

The District Court also found that "[t]he VQPs contain an at-will termination provisions [sic]," which it declared to be "strong evidence" of "a right to control."  ER104.  One problem with this finding is that it is factually untrue.  Many VQPs in use during the class period do not contain any termination provision at all.  *See, e.g.*, ER457-59; ER461-77; 479-94; 611-22; 720-77; 852-913; 922-60.  Another problem is that the two exemplar provisions (appearing in a 2011 VQP and 2014 "Master Services Agreement") the District Court highlighted both permit "a mutual right to terminate the agreement" – either side could cancel. ER73.  Such a provision "augurs *against*" employee status.  *Beaumont-Jacques v. Farmers Group, Inc.*, 217 Cal.App.4th 1138, 1147 (2013) (emphasis added); *see also Hennighan v. Insphere Ins. Solutions, Inc.*, 38 F.Supp.3d 1083, 1100 (N.D. Cal. 2014) ("A mutual termination clause is evidence of an independent contractor relationship.").

Still another problem with the District Court's reasoning is that it overstates the significance of at-will termination.   "An independent contractor agreement can properly include an at-will clause giving the parties the right to terminate the agreement.  Such a clause does not, in

and of itself, change the independent contractor relationship into an employee-employer relationship. If it did, independent contractor arrangements could only be established through agreements which limited the right of a party, or perhaps both parties, to terminate the agreement. This would be absurd, and it is not the law." *Varisco v. Gateway Sci. & Eng'g, Inc.*, 166 Cal.App.4th 1099, 1107 (2008).

### c.  Negotiable rates and terms.

Negotiation "for higher rates" and different terms is something "independent contractors commonly can" do. *Ruiz*, 754 F.3d at 1101. It is also something vendors can do. FAS offered substantial evidence that negotiation over rates and terms regularly occurred, often successfully for vendors. *See* pages 6-9, *supra*. The named plaintiff, for example, counteroffered prices for eleven types of services, and FAS accepted seven of them and compromised on the other four. ER560; 781-83. The named plaintiff even went a step further, offering prices for services not on the FAS proposal, inviting FAS to "take a look at these prices and let me know if we can do bussiness [sic] with them." ER560-61; 783-84.

The District Court grudgingly acknowledged FAS's evidence, remarking "that these circumstances are not as clear cut" as those in

which workers "could not negotiate *at all*," ER102, but marginalized it, asserting "that negotiations were illusory because FAS had the final say." *Id.* This was error not only because it is untrue – witness the Claimants' and named plaintiff's own successful negotiations – but because there is no such thing as a unilateral "final say" in an agreement. *Each* side accepts the terms or there is no agreement.

### d. Right to decline work.

Relying on anecdotal evidence, ER75-76, the District Court believed that FAS engaged in "pressuring vendors not to decline work orders within their listed zip codes and encouraging them to expand their capabilities" or else face adverse consequences. ER103. But FAS presented contrary evidence that not only are vendors free to decline FAS work orders, they have done so if they were too busy, the work was outside the agreed-upon coverage area, for other reasons, or no reasons at all. *See* page 9, *supra*. The District Court simply chose to believe plaintiffs' anecdotal evidence. That choice was incompatible with summary judgment standards, under which the *nonmovant's* evidence must be believed. *Narayan*, 616 F.3d at 899.

## 2. Manner and means.

The evidence further showed that FAS did not meaningfully control the manner or means of vendors' work.

### a. FAS does not control how work is performed.

The District Court made much ado of the fact that VQPs "set out pages of specific requirements, which the work orders elaborate through meticulously detailed task lists." ER104. "The vendor profiles," it continued, further "demonstrate that FAS not only retained the right to control the vendors but actually exercised that control through extensive supervision and a regimented discipline program." ER105. "FAS also supervises vendors' work through frequent updates, photo documentation requirements, and quality control site inspections," the District Court emphasized. ER76.

None of this is evidence of control. As an initial matter, this depiction of "specific requirements" and "extensive supervision" proves too much. Under California law, "an employer who controls the manner in which the work is done has little need of establishing quality standards for completed work; such standards are indicative that [the employer's] primary interest was in the quality of the result rather than

the manner in which the work was done *and constitutes evidence that [the worker] was an independent contractor.*"  *Missions Ins.*, 123 Cal.App.3d at 224 (emphasis added).  There may be "a broad general power of supervision and control as to the results of the work so as to ensure satisfactory performance of the independent contract – including the right to inspect, the right to make suggestions or recommendations as to details of the work, the right to prescribe alterations or deviations in the work – without changing the relationship from that of owner and independent contractor."  *Beaumont-Jacques*, 217 Cal.App.4th at 1143 (internal quotation marks omitted).

Another court better understood this work-details/work-results distinction, granting summary judgment to FAS on the question of whether a property preservation vendor was FAS's employee.  *See McLeod*, 2017 WL 338002, at *5.  Unlike the District Court below, the *McLeod* court found that "FAS merely authorizing work, reviewing the quality of work, inspecting work, reviewing photographs of work, etc. performed by [the vendor], is not tantamount to *controlling* [the vendor's] work or *how* [the vendor] performed the work.  Rather, those

aspects are more akin to checks on the quality of the work, not control over the manner in which such work was done." *Id.*

Similarly, another court applying Ohio law ruled that an FAS competitor (Safeguard) also did not employ its vendors:

> Safeguard does not employ individuals to go out to the properties and perform preservation work. Instead, all of the work is completed by independent subcontractors. The independent subcontractors provide Safeguard with their tax ID information and they must provide their own insurance. The independent subcontractors determine the means of performing the work. Safeguard does not provide specific instructions as to what tools or products should be used. Furthermore, an independent subcontractor is permitted to retain a subcontractor on its behalf.

*Pearson v. PNC Bank, N.A.*, No. 15-1377, 2017 WL 1199125, at *5 (N.D. Ohio Mar. 31, 2017). If federal judges may differ about the inferences to be drawn, then surely reasonable jurors may do so too.

In addition to proving too much, the District Court's depiction proves too little. Consider the "pages of specific requirements." ER104. VQP and work order specifications are largely driven by compliance with government-mandated rules. The rules include, for example, the "Property Preservation Matrix and Reference Guide" required by Fannie Mae, acting under the Federal Housing Finance Agency's

supervision, and HUD's "Property and Preservation Guidelines," which govern preservation of properties subject to government-insured mortgages. Even a casual review reflects that these rules comprehensively govern property preservation activities. *See* pages 9-11, *supra*. For example, Fannie Mae and HUD each impose before-and-after photography requirements. ER414; 433; 441.

This, too, does not show control. "[T]hat a putative employer incorporates into its regulations controls required by a government agency does not establish an employer-employee relationship." *SIDA of Haw., Inc. v. NLRB*, 512 F.2d 354, 359 (9th Cir. 1975). Last year the California Court of Appeal held that a "putative employer does not exercise *any* degree of control merely by imposing requirements mandated by government regulation." *Linton v. Desoto Cab Co.*, 15 Cal.App.5th 1208, 1223 (2017) (emphasis added); *see also Sw. Research Inst. v. Unemployment Ins. Appeals Bd.*, 81 Cal.App.4th 705, 709 (2000).

"Additional restrictions or modifications made to government regulations" can be "indicia of employer control," 15 Cal.App.5th at 1224, but the District Court never made any factfinding as to what, if any, "restrictions" or "modifications" FAS added to the government's

requirements, nor did plaintiffs themselves attempt to parse the requirements. Regardless, jurors could infer that the VQPs and work orders – even those that might exceed the exact requirements set out in the government-mandated rules – do not show control because they are designed to implement the rules' more general directive that FAS's clients fulfill their preservation responsibilities, ensuring standardization and uniformity.

To support its ruling, the District Court cited a handful of federal decisions suggesting that requiring adherence to government-mandated rules does, in fact, "substantiate[] evidence of control." ER103. Each decision cited, however, antedates *Linton*, which disavowed that notion. Citing *Linton*, California courts have since declined to follow the same federal decisions relied on by the District Court, *as well as the District Court's decision itself. See Valadez v. CSX Intermodal Terminals, Inc.*, 298 F.Supp.3d 1254, 1280-81 (N.D. Cal. 2018). This Court should do the same, finding that requiring adherence to government-mandated preservation requirements does not evince *any* degree of control.

Still other aspects of FAS's supposedly "extensive supervision" do not show control. Vendor "scorecards" containing performance metrics

were simply a quantitative tool for vendors to manage their businesses. ER76. Scorecards were discontinued in 2012 anyway. ER513. And, as the *McLeod* court found, photographs and site visits "are more akin to checks on the quality of the work, not control over the manner in which such work was done." 2017 WL 338002, at *5. An FAS "Field Quality Control Specialist" attested that his inspections only ensure "the work has been completed – I don't care how it gets done." ER573; *see also Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 452 (9th Cir. 2018) (that putative employer "provided some training and oversight at [a telemarketing] call center" and "visited the call center about a dozen times over the course of three years" favored finding that the "telemarketers were not subject to the requisite level of control"); *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 683 (9th Cir. 2009) ("monitoring and inspections" were "performed to determine whether suppliers were meeting their contractual obligations, not to direct the daily work").

The District Court found that some vendors "felt that FAS retained various rights," but acknowledged others "who assert that they had the right to control their own work." ER90. Some were not supervised *at all*. ER371; 588-591. The District Court personally

disagreed with the inferences to be drawn from this evidence, but that did not empower it to enter summary judgment. "The inferences here are subject to legitimate dispute," *Narayan*, 616 F.3d at 901, as is obvious from a contrary summary judgment ruling in FAS's favor on this very issue. *See McLeod*, 2017 WL 338002, at *5.

### b. FAS does not control who performs work.

Employee status depends in part on whether the putative employer may decide who performs the job. It is difficult for a company to control *how* a job gets done if the company cannot even decide *who* does it. FAS does not exercise control over whom vendors employ to perform property preservation. Vendors are free to, and do, assign work to whichever assistants they like. Some vendors hire subcontractors, while others maintain stables of employees. *See* pages 11-13, *supra*.

The District Court dismissed this evidence too, stating that it would only "consider FAS's right to control the class members, not other workers that may have serviced FAS properties." ER104. The idea of a putative employer having the right to control, however, has little import if employees can delegate the work. Whether the putative employee hires assistants is a highly relevant concern. *See Brown*, 32

Cal.App.4th at 202 (right "whether or not to hire assistants" relevant to right-to-control factor); *Missions Ins.*, 123 Cal.App.3d at 222 (same); *accord Pearson*, 2017 WL 1199125, at *5 (same).

The District Court further reasoned that vendors' discretion is limited because FAS asks them to perform background screening of employees used for FAS jobs. ER104. Background screening or not, however, FAS still lacks control over who vendors ultimately use. *See Lawson v. Grubhub, Inc.*, 302 F.Supp.3d 1071, 1084 (N.D. Cal. 2018) (although "Grubhub did reserve the right to perform a background check on any worker to whom Mr. Lawson subcontracted," "the fact remains that Grubhub had no control over whom, if anyone, Mr. Lawson wanted to accompany him").

### c. FAS does not control workers' schedules.

FAS did not schedule workers' time, requiring only that the job itself be completed within 72 hours of accepting it. Vendors maintain complete discretion scheduling their personnel, including arrivals, departures, and breaks. *See* pages 5-6, *supra*.

The District Court found this "disingenuous," citing the 72-hour window and opining that control over workers' schedules is "a small

consideration." ER102. But scheduling is an important consideration, not a "small" one. The District Court itself thought quite differently in another misclassification case: "An individual who determines his own hours and break times 'on most days' exercises 'meaningful discretion.'" *Hennighan*, 38 F.Supp.3d at 1100. Other courts hold the same view. *See Jones*, 887 F.3d at 451 (finding significant the fact that company "did not have the right to control the hours the telemarketers worked"); *Beaumont-Jacques*, 217 Cal.App.4th at 1147 (worker exercised "meaningful discretion" by "determining her own day-to-day hours," and "fixing the time for her arrival and departure").

The 72-hour window is irrelevant. Independent contractorships everywhere might cease to exist if deadlines were deemed evidence of control. The window relates to the timely completion of the job itself, indicating control over results, not the manner or means of work. *See Alexander*, 765 F.3d 990 (control over "results" in the delivery context means "timely and professional delivery of packages"); *Doe I*, 572 F.3d at 683 (deadlines are not "day-to-day control" creating employment relationships); *Hennighan*, 38 F.Supp.3d at 1101 (monitoring sales

42

agents' productivity and setting goals relates to results expected, "not the manner by which agents had to achieve those goals").

### d. There is conflicting evidence about training.

Required training does not necessarily indicate employee status. *See Missions Ins.*, 123 Cal.App.3d at 221 (that worker "attended lectures or classes" is not evidence the company "controlled the manner in which the desired result was to be achieved"). The District Court nonetheless repeatedly referenced informational sessions FAS offered to vendors, calling them "mandatory." ER78-79; 92.

FAS submitted evidence denying that suggestion, ER400; 574, and countered with "vendor testimony that they were never offered any training" at all. ER78; 372; 527. FAS further explained that when vendors contract with FAS, "they're representing to us that they have this skill set needed for the services they're providing," and that the so-called "training" was not to improve skills but to assist in interfacing with FAS and its systems, *e.g.*, "how to report information for work orders." ER400; 580-81. The District Court simply credited plaintiffs' evidence over FAS's. Here, again, this disregard of conflicting evidence

was incompatible with summary judgment standards, under which the *nonmovant's* evidence is to be believed. *Narayan*, 616 F.3d at 899.

## C. The Secondary Factors Also Raise Triable Issues.

Genuine disputes exist as to the right-to-control factor, so summary judgment should be vacated on that basis alone. After all, the District Court ruled that if it "ignored the right to control analysis, and focused solely on the secondary factors," then it "would not grant summary judgment." ER106. "[S]ome factors favor viewing the vendors as independent contractors, and some as employees." *Id.* If considered as part of the holistic analysis intended by *Borello*, however, the secondary factors raise additional triable issues.

### 1. Multiple factors were found to favor FAS.

Four factors – intent to create an independent contractor relationship, opportunity for profit or loss, employment of assistants, and method of payment – unquestionably favored FAS, as the District Court found. *See* ER110-11. In particular, vendors are not paid by the hour but by the job, a "strong indicator" that FAS lacked authority to control them. *See Jones*, 887 F.3d at 452; *Missions Ins.*, 123 Cal.App.3d

at 222 (piecemeal compensation "points strongly toward independent contractor status"); Restatement (Second) of Agency § 220 cmt. j (1958)

And, although it found that a fifth factor – the provision of tools and equipment – favored neither side, the District Court should have given greater weight than it did to the "undisputed" fact "that vendors purchase their own tools and equipment." ER109. "The ownership of the instrumentalities and tools used in the work is of importance." Restatement, *supra*, § 220 cmt. k. That is especially true for those vendors who have invested tens of thousands of dollars in equipment and other assets. *See Brown*, 32 Cal.App.4th at 203 (truckers made "a substantial investment" in trucks "beyond the provision of their labor"). And, *contra* the District Court, FAS does not supply the place of work. ER109. Rather, it routes vendors to properties owned by FAS's clients.

### 2. Other factors raise genuine factual disputes.

Other secondary factors do not support summary judgment.

### a. Regular part of FAS's business.

Courts applying *Borello* ask whether the work performed "is part of the principal's regular business." *Curry v. Equilon Enters.*, 23 Cal.App.5th 289, 307 (2018). "For example, if a bakery hires cake

decorators to work on a regular basis, then those cake decorators are likely working within the bakery's 'usual business operation,' and thus would be employees." *Id.* at 315.

On the other hand, a gas station manager who works for a company that operates gas stations would not work within the "usual business operation" of a different company that owns the stations and the fuel sold there. *See id.* Although their activities are so mutually interdependent that neither could function without the other, the first company is in the business of operating gas stations and the second is in the business of owning and supplying fuel to those stations. *See id.* & *id.* at 307-08 ("Shell was not in the business of operating fueling stations – it was in the business of owning real estate and fuel.").

Similarly, "if the owner of an apartment complex hires a property management company, and that property management company hires an on-site manager for the complex, the owner is not engaged in the business of property management. Rather, the owner is in the business of owning real estate, while the property management company is in the business of managing properties." *Id.* at 307.

Vendors perform on-site property preservation services. FAS does not. FAS *coordinates* the completion of preservation services for its clients, a distinctly different activity. Although the parties' respective businesses are mutually interdependent, their skill sets and outputs do not overlap. This is distinguishable from the cake-decorator example given above because a bakery's output *is* baked goods like decorated cakes, whereas FAS's output is logistics and labor brokering for its clients, not on-site property preservation. *See Nev. Dep't of Employment v. Reliable Health Care Servs. of S. Nev., Inc.*, 115 Nev. 253, 259 (1999) ("that a temporary agency profits solely from referring temporary health care workers" does not overcome "the simple fact that providing patient care and brokering workers are two distinct businesses").

That FAS "would not have a business to coordinate without the work of the vendors," as the District Court reasoned, ER110, proves nothing. The same could be said about companies that own gas stations and the fuel sold there – they would not have retail businesses without gas station operators. And the same could be said about apartment complex owners – they would not have rental businesses without property managers. In both examples, however, the work performed is

not deemed part of the principal's regular business. *See Curry*, 23 Cal.App.5th at 307-08.

### b. Distinct occupation or business.

Vendors operate independent businesses. The Claimants, for example, have operated separately incorporated companies or distinct sole proprietorships, employed others to perform field and administrative work, invested in and supplied their own tools, equipment, vehicles, office space, and other assets, worked with FAS competitors or other clients, and marketed themselves though advertising and other promotional methods. *See* pages 11-15, *supra*. Many vendors, including some Claimants, are California-licensed general contractors, *see* page 15, *supra*, strongly suggesting they engage in a distinct occupation. *See Missions Ins.*, 123 Cal.App.3d at 224 (that plaintiff held himself out as being in business for himself, registered a fictitious name, and obtained a state license were "highly significant factors" supporting independent contractorship); *Arnold v. Mut. of Omaha Ins. Co.*, 202 Cal.App.4th 580, 589 (2011) (plaintiff "engaged in a distinct occupation requiring a license").

The District Court was unconvinced. Quoting the class definition, it reasoned that "[w]hile class members may have had the right to work for others, many did not, and none 'worked any other entity more than 30 percent of the time.'" ER107.

The District Court cited no legal authority holding that a vendor's decision to work predominantly for one company necessarily means the vendor is not engaged in a distinct business of its own. The "better approach" is to ask "whether the service in question could be viewed as an independent trade or business because the worker is *capable* of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business *compels* the worker to depend on a single employer for the continuation of the services." *Athol Daily News v. Bd. of Review of Div. of Employment & Training*, 439 Mass. 171, 181 (2003) (emphases added).

Those questions are easily answered here. As the District Court found, all class members "had the right to work for others," ER107, including FAS competitors. Many in fact did so. *See* pages 13-14, *supra*. The District Court never asked itself whether a vendor's decision to work more than 70 percent of the time for FAS means the

vendor was "compelled" to do so or just preferred to do so. The duration of the parties' relationship also would be relevant to the "dependency" question, as the District Court recognized in initially denying class certification. ER163-64. It would be implausible to say that a vendor "depended" on FAS if the relationship was relatively brief. A nuanced, case-specific understanding of each relationship is thus required.

The *Curry* decision further demonstrates how the District Court misapplied this factor. There, the plaintiff gas station manager worked at two stations leased to a station operator (ARS) by a company (Shell) that owned the stations and the fuel sold there. 23 Cal.App.5th at 294-95, 305. The plaintiff alleged he was Shell's employee. The *Curry* court found otherwise, observing that, as a station manager, the plaintiff supervised five to seven cashiers and thus "was engaged in the distinct occupation of an ARS station manager." *Id.* at 305. The "management of the gas stations was distinct from the type of business Shell engages in, which is the ownership of real estate and fuel." *Id.* at 315.

So too here. Vendors have established their own operations. They determined their own business strategies, made their own business decisions, and chose whom they would target as clients, even if in the

end that meant electing to work predominantly for FAS. Their skills, assets, personnel, licensing, marketing, and corporate forms can be distinguished from those of FAS. In short, the management of vendors' property preservation businesses is distinct from FAS's business, the *coordination* of the completion of preservation services.

### c. Exclusivity of relationship.

A similar analysis applies to the exclusivity-of-relationship factor. Vendors were free to, and did, provide services for FAS competitors and other clients. *See* pages 13-14, *supra*. Again citing no legal authority to support its reasoning, the District Court found that this freedom "does not matter" because class members "had a nearly exclusive relationship with FAS." ER112. Yet it is the *imposition* of exclusivity – not a preference to work with one company – that matters. *See Yellow Cab Coop. v. Workers' Comp. Appeals Bd.*, 226 Cal.App.3d 1288, 1298 (1991) ("Nor is the paradigmatic independent contractor *bound* to serve one principal exclusively. *By imposing such a restriction*, Yellow exerted a form of control typical of employment and not of other relationships.") (emphases added); *Kim v. Sumitomo Bank*, 17 Cal.App.4th 974, 983 n.2 (1993) (although putative principal (Bank) "had an exclusive

relationship with" putative agent (BDI), "the Bank did not specifically require that only BDI be used as the disbursing agent"). The District Court misapplied this factor too.

### d.  Performance under principal's direction.

Whether work is performed under the principal's direction largely duplicates the right-to-control factor, the District Court noted. ER108. As explained above, genuine disputes have been raised in this regard.

### e.  Other factors.

The District Court found that two other secondary factors – the skill required and length of time of performance – favored employee status. Even if those findings were correct (FAS disputes them), that would not have made summary judgment appropriate. ER106.

### D.  The *Dynamex* ABC Test Does Not Apply.

### 1.  *Dynamex* does not apply to joint-employer cases.

The Claimants will likely urge that a legal framework different from *Borello* applies. They would be mistaken.

The "economic realities" test articulated in *Borello* stood as California's exclusive test for employee status until April 2018, when the California Supreme Court enunciated a new test for "determining

whether workers should be classified as employees or as independent contractors *for purposes of California wage orders*" – the ABC test. *Dynamex*, 4 Cal.5th at 913. Under that test, "unless the hiring entity establishes (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact, (B) that the worker performs work that is outside the usual course of the hiring entity's business, and (C) that the worker is customarily engaged in an independently established trade, occupation, or business, the worker should be considered an employee and the hiring business an employer under the suffer or permit to work standard in wage orders." *Id.* at 964.

"*Dynamex* did not purport to replace the *Borello* standard in every instance where a worker must be classified as either an independent contractor or an employee for purposes of enforcing California's labor protections." *Cal. Trucking Ass'n v. Su*, 903 F.3d 953, 959 n.4 (9th Cir. 2018); *see also Garcia v. Border Transp. Group, LLC*, 28 Cal.App.5th 558 (2018) (same). Among other things, *Dynamex* was never intended to apply to the joint-employment context, and its ABC test therefore does not apply here. "Joint employment occurs when two or more

persons engage the services of an employee in an enterprise in which the employee is subject to the control of both." *Morales v. 22nd Dist. Agric. Ass'n*, 1 Cal.App.5th 504, 543 (2016).

In *Curry*, the California Court of Appeal cabined *Dynamex*, concluding that "it does not appear that the Supreme Court intended for the 'ABC' test to be applied in joint employment cases." 23 Cal.App.5th at 314. *Dynamex* was driven by concerns that misclassification was "'depriving federal and state governments of billions of dollars in tax revenues and millions of workers of the labor law protections to which they are entitled.'" *Id.* at 313 (quoting *Dynamex*, 4 Cal.5th at 913).

In the joint-employment context, however, "the primary employer is presumably paying taxes and the employee is afforded legal protections due to being an employee of the primary employer. As a result, the policy purpose for presuming the worker to be an employee and requiring the secondary employer to disprove the worker's status as an employee is unnecessary in that taxes are being paid and the worker has employment protections." *Id.* at 313-14.

Here, the Claimants are putatively FAS employees, but they are more evidently employees of the preservation businesses for which they

worked. Individuals "are ordinarily considered employees of their respective corporations, even if they are the sole shareholder." *In re Carter*, 182 F.3d 1027, 1031 n.5 (9th Cir. 1999). The vendors made recruiting, hiring, compensation, scheduling, and termination decisions with respect to their personnel. Vendors ranged in size, chose which services they would provide, and often maintained their own Employer Identification Numbers, indicating that they paid employment taxes. *See* page 12, *supra*. As there are two would-be employers here – FAS (putatively) and the vendor (actually) – this is a joint-employment case and the ABC test does not apply.

### 2. *Dynamex* does not govern plaintiffs' expense-reimbursement claims.

Regardless, the ABC test does not supplant the *Borello* test's application to the expense-reimbursement claims here, which are not properly premised on any California wage order. *Dynamex* only decided "what standard applies, under California law, in determining whether workers should be classified as employees or as independent contractors *for purposes of California wage orders*," 4 Cal.5th at 913, not other purposes. The *Dynamex* court observed that "when different statutory schemes have been enacted for different purposes, it is possible under

*Borello* that a worker may properly be considered an employee with reference to one statute but not another." *Id.* at 948. The *Dynamex* court specifically declined to reach the issue of whether *Borello* no longer governs expense-reimbursement claims. *Id.* at 916 n.5.

*Dynamex* thus neither altered California law governing expense-reimbursement claims nor offered any reason why it should be altered. California courts have long applied *Borello* to such claims, *see, e.g.*, *Garcia*, 28 Cal.App.5th 558 (*Borello*, not *Dynamex*, applies to non-wage order claims under Cal. Labor Code § 2802); *Arnold*, 202 Cal.App.4th at 586-88, and this Court should continue to do so. Absent "convincing evidence" that a state's highest court would decide a matter differently – evidence missing here – "a federal court is obligated to follow the decisions of the state's intermediate courts." *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990).

Recognizing this, after *Dynamex* was decided, plaintiffs attempted to belatedly invoke Wage Order No. 5, Cal. Code Regs., tit. 8, § 11050, which regulates wages, hours, and working conditions in the "public housekeeping industry." Wage Order No. 5, however, was not identified in plaintiffs' complaint. ER978-98. A complaint cannot be amended by

introducing new theories in late-stage briefing. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006).

Regardless, although it arguably requires reimbursement of tools and equipment (but not other types of expenses the Claimants recovered at trial), Wage Order No. 5 does not apply to the business of property preservation for mortgage-servicing clientele. Property preservation is not a "*public* housekeeping" function, the essence of which is to provide meals, housing, or maintenance services at locations where the public is invited. *See* Cal. Code Regs., tit. 8, § 11050, subd. 2(P) (emphasis added). Vendors provide services at locations where the public is *not* invited. Property preservation falls, if at all, under Wage Order No. 17, *id.* § 11170 – regulating "miscellaneous employees" – which does not mandate reimbursement of *any* expense.

### E. Even If The ABC Test Applies, Triable Issues Remain.

The ABC test should not apply here at all. Nonetheless, because "much of the analysis" regarding the *Borello* factors applies equally to the *Dynamex* factors, *see Curry*, 23 Cal.App.5th at 314, out of an abundance of caution, the ABC test also is analyzed here.

"The 'A' factor requires an examination of whether the 'worker is free from the control and direction of the hiring entity.'" *Id.* (quoting *Dynamex*, 4 Cal.5th at 964). As discussed above, a reasonable jury could conclude that FAS did not control or direct the Claimants. Nothing in the parties' contracts or course of conduct definitively establishes the Claimants' purported status as employees. *See* pages 28-44, *supra*. If anything, they were independent contractors. *See Curry*, 23 Cal.App.5th at 314-15 (applying identical analysis regarding *Borello* right-to-control factor to "A" factor).

"The 'B' factor requires an examination of whether 'the worker performs work that is outside the usual course of the hiring entity's business.'" *Id.* at 315 (quoting *Dynamex*, 4 Cal.5th at 964). FAS does not itself perform preservation services. Rather, it *coordinates* the completion of preservation services, an activity distinctly different from the business of property preservation. *See* pages 45-51, *supra*. Vendors therefore do not perform work within the "usual course" of FAS's business. *See Curry*, 23 Cal.App.5th at 315 (applying identical analysis regarding relevant *Borello* secondary factors to "B" factor).

"The 'C' factor requires evidence 'that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.'" *Id.* (quoting *Dynamex*, 4 Cal.5th at 964). "This factor can be proven with evidence that the worker has 'taken the usual steps to establish and promote his or her independent business – for example, through incorporation, licensure, advertisements, routine offerings to provide the services of the independent business to the public or to a number of potential customers, and the like.'" *Id.* (quoting 4 Cal.5th at 962).

The Claimants and other vendors operate separately incorporated businesses or distinct sole proprietorships; employed assistants; invested in and supplied their own equipment, tools, vehicles, office space, and other assets; worked with FAS competitors or other clients; promoted themselves though advertising and marketing; and held business and occupational licenses. *See* pages 11-15, *supra*. The "C" factor does not apply either. *See Curry*, 23 Cal.App.5th at 315 (applying identical analysis performed regarding *Borello* right-to-control and relevant secondary factors to "C" factor).

In short, summary judgment in the Claimants' favor was inappropriate under either the *Borello* or *Dynamex* tests. The judgment below should be reversed or vacated.

## II. No Class Should Have Been Certified.

### A. Adjudicating The Relevant Factors Requires Evaluating Disparate Experiences And Evidence.

Class certification was equally inappropriate. Virtually every factor of the *Borello* test (and the analytically overlapping *Dynamex* test) raises a host of factual inquiries unique to each class member.

To justify class certification here, there must be "questions of law or fact common to class members" that "predominate over any questions affecting only individual members," and the class format must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). The "predominance" inquiry asks whether proposed classes are "sufficiently cohesive" to warrant adjudication by representation. *Wells Fargo*, 571 F.3d at 957. And, in the specific context of employment misclassification adjudged under the *Borello* (or *Dynamex*) factors, "the issue is whether these factors may be applied on a classwide basis, generating a classwide answer on the issue of employee status, or

whether the determination requires too much individualized analysis."

*Narayan v. EGL, Inc.*, 285 F.R.D. 473, 478 (N.D. Cal. 2012).

Classwide answers and cohesion do not exist here. The record is plagued by factual permutations bearing on the right-to-control and secondary factors (and their *Dynamex* analogues). Consider:

- Some VQPs expressly acknowledge independent contractor status; others do not.

- Vendors' "beliefs that they are employees or independent contractors may vary by vendor." ER164.

- Some VQPs contain mutual termination provisions; some do not contain termination provisions at all; others contain differing termination provisions.

- Many vendors have successfully negotiated changes to FAS-proposed prices and other terms; others do not negotiate successfully or at all.

- The method of payment "varies depending on the negotiating power of the vendor and type of contract," *e.g.*, "[a] contract won by bid is categorically different than the type of an adhesion contract." *Id.*

- Some vendors profess to have undergone "mandatory" training by FAS; others were not required to receive any training at all.

- Some vendors hire many employees and subcontractors; some hire fewer assistants; others are solo operations.

- Some vendors gross in excess of $1 million annually; others earn far less.

- Many vendors invest tens of thousands of dollars or more in tools, equipment, and other assets; others invest more modestly.

- Some vendors contracted with FAS while it was still using scorecards; others became, or continue to be, contracted with FAS after it discontinued scorecards in 2012.

- Some vendors hold occupational licenses; others do not.

- Many vendors promote themselves extensively through advertising, apparel, business cards, and the like; others do less marketing.

- Some vendors worked for FAS competitors or clients besides FAS; others worked nearly exclusively for FAS.

- Some vendors had brief relationships with FAS; others had longer ones.

Any careful analysis of a vendor's status as an independent contractor or an employee must turn on the combination of facts unique to the vendor. That alone defeats a predominance of common questions.

True, no single fact or factor will be dispositive, but that is the point. "Even if the factor is not dispositive, it is a factor which might be litigated, requiring individual testimony at trial." *Sotelo v. MediaNews Group, Inc.*, 207 Cal.App.4th 639, 659 (2012). For example, although "a class member's belief about his or her status will not defeat employment status and, as a subjective standard may be entitled to less weight, it

may still be a subject of litigation at trial, given the holistic nature of the inquiry." *Id.* And "even if other factors were able to be determined on a classwide basis, those factors would still need to be weighed individually, along with the factors for which individual testimony would be required." *Id.* at 660; *see also Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 480-84 (N.D. Cal. 2017) (even if right-to-control factor *and* multiple secondary factors are amenable to common proof, class certification remains improper because other secondary factors are not); *Ali v. U.S.A. Cab Ltd.*, 176 Cal.App.4th 1333, 1349-52 (2009) (varying evidence relevant to *Borello* factors, including class members' subjective beliefs, precluded class certification).

The District Court nonetheless justified class certification by relying heavily on the revised class definition, which excludes those who spent less than 70 percent of their time working for FAS. ER91; 134-38. Before introducing this percentage limitation, the District Court had *denied* certification, correctly perceiving "significant differences among the putative class members." ER162. The percentage limitation is no panacea. It only pares certain aspects of the employee status inquiry –

it does not eliminate them entirely and it does not resolve other aspects relevant to the certification question.

In the District Court's view, "the new class definition greatly diminishes the variation among class members with respect to how often and to what extent they negotiate and/or bid for their contracts with FAS." ER134. But that variation remains post-revision. If anything, the record is riddled with evidence of routine, successful negotiations over prices and other terms, including negotiations by the named plaintiff, Claimants, and class members. *See* pages 6-9, *supra*.

"The new class definition," the District Court continued, "also addresses the problem that some vendors are not substantially dependent on FAS for their revenue." ER135. This views the matter through the wrong lens. That vendors worked predominantly for FAS does not prove their dependency on FAS – it might equally prove their preference for FAS. One cannot know the difference without conducting individualized inquiries. For example, dependency cannot be intelligently evaluated without separately examining the duration of each relationship. Nor does the percentage limitation negate the fact that many vendors not only sought out non-FAS clientele, they worked

for them up to 30 percent of their time and held themselves out as independent businesses in all other respects.  *See* pages 11-15, *supra*.

The percentage limitation thus offers no evidentiary shortcut.  To the contrary, it only *complicates* matters, necessitating individualized inquiries into whether any given vendor did, in fact, work for FAS more than 70 percent of the time.  That evidence must come, if at all, directly from each vendor.

The District Court also emphasized that, in its opinion, the right-to-control factor is amenable to common proof.  ER137.  We have already seen that the District Court's control-related assumptions are a house of cards.  Much of the purported evidence of control – job specifications, photograph review and site visits, "training," termination provisions, scorecards, and so forth – is really no evidence at all, not universal across the class, or both.  *See* pages 28-44, *supra*.

And even if FAS "has standardized many if not all aspects of its relationship" with vendors, "the court cannot look only to the details of the relationship as specified between the two parties but must also consider the employer's and presumptive employee's situations.  For example, the *Borello* factors require assessment of the alleged

employee's investment in equipment or materials and his employment of helpers, and the nature of the employer's business." *Narayan*, 285 F.R.D. at 480. Vendors – some large, some small, some highly entrepreneurial, some less so – "were situated very differently in their operations." *Id.* Predominance is therefore lacking.

## B. No Common Evidence Exists To Prove Overtime Hours Worked Or Reimbursable Expenses Incurred.

Predominance is lacking for another reason. All agree that plaintiffs cannot prove, through common evidence, that class members worked overtime hours or that claimed expenses are reimbursable. "The lack of documentation on hours worked [and expenses incurred] makes it unlikely that plaintiffs can create a model that aggregates damages on a classwide basis. Proof by the testimony of vendors," *literally one-by-one*, "is necessary," the District Court concluded. ER4-5. And, because of the "lack of documentation," proof must come from class members' fast-fading memories, necessitating fact-intensive credibility determinations. In the District Court's words, any class trial will be

"onerous," "cumbersome," and "far messier than promised by plaintiffs' counsel when [the District Court] certified this case." *Id.*[1]

Even that grim assessment is understatement. At the bellwether jury trial, the parties needed eight court days to try some (not all) of the Claimants' claims. At that rate, the parties would need at least 105 court days – more than five straight months – to try the remaining class members' claims. FAS doubts that any jury collectively possesses the patience to endure a five-month trial at which streams of witnesses will testify to the number of hours he or she allegedly worked years ago, together with the undocumented expenses he or she allegedly incurred.

This was insufficient to convince the District Court to decertify. It believed that "class certification should not be denied solely due to manageability concerns." ER5. True, in many cases, "the amount of damages is invariably an individual question and does not defeat class action treatment." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (internal quotation marks omitted). But the Supreme Court

---

[1] The District Court certified the class on plaintiffs' promise that "there was going to be some sort of a way of cohering these damages" through classwide expert and survey-based evidence. ER363. Plaintiffs reneged on their promise when their evidence later proved to be unreliable under *Daubert* scrutiny. ER4; ER356.

has explained that plaintiffs "cannot show Rule 23(b)(3) predominance" if they cannot establish "that damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Otherwise, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.*

This Court recently reversed a class certification on this basis. In *Doyle v. Chrysler Group, LLC*, the plaintiff had "not demonstrated that partial reimbursement damages can be measured on a classwide basis," so "the predominance requirement is not satisfied." 663 F.App'x 576, 579 (9th Cir. 2016). The "understanding" that individualized damages, by themselves, do not defeat certification, *Doyle* explained, applies only "in cases where there existed a common methodology for calculating damages." *Id.* "In those cases," like *Leyva*, "'damages could feasibly and efficiently be calculated once the common liability questions are adjudicated.'" *Id.* (quoting *Leyva*, 716 F.3d at 514).

This case does not fit that mold. Damages cannot be calculated "feasibly and efficiently" even if, in the District Court's view, "FAS retained 'all necessary control'" and "vendors were required to work overtime and expend their own money for business expenses." ER4-5.

Consider the overtime compensation claims. "[S]imply having the status of an employee does not make the employer liable for a claim for overtime compensation." *Sotelo*, 207 Cal.App.4th at 654. Yet there is no evidence that all class members actually worked overtime hours or, if worked, the amount.[2] There is no model or formula by which to tabulate hours, no expert evidence by which to estimate them, and no reliably representative testimony from which to extrapolate them. The jury will have to decide claims based solely on each class member's personal credibility, doing so in light of the significant passage of time since the hours were allegedly worked.

And there is the further complication that class members who performed work for FAS competitors or other clients must separately show the hours worked for each. The class definition includes members who worked for others up to 30 percent of their time, and members did, in fact, work for others to varying degrees.

The expense-reimbursement claims are even *more* complicated. The expenses potentially recoverable are neither predictable nor subject

---

[2] Whether overtime hours were worked is not just an issue of damages, but also liability. *See Koike v. Starbucks Corp.*, 378 F.App'x 659, 661 (9th Cir. 2010) (variation in overtime hours "speaks to variations in Starbucks' *liability* as opposed to merely at the damages stage").

to ready calculation. They will vary widely, ranging from no (or almost no) expenses claimed to expenses totaling six figures. ER56. Here, too, there is no model or formula by which to tabulate expenses, no expert evidence by which to estimate them, and no representative testimony from which to reliably extrapolate them. Worse, proving entitlement to expenses requires quantitative and qualitative proof about the incurment, necessity, apportionability to FAS (versus another vendor's client), and reasonableness of each expense. For example, expenses must be "necessary," not simply "job-related." Cal. Labor Code § 2802(a). And many class members did not maintain expense-related records, again meaning that the jury will have to decide claims based solely on each member's personal credibility.

These are equally grounds for reversing certification. In *Harris v. Vector Marketing Corp.*, another employee-misclassification case, the court "acknowledge[d] that, arguably, [the defendant] had a uniform policy or practice of not reimbursing for any expenses and that the different expenses incurred would simply be an issue of individualized damages, which, under Ninth Circuit law, should not alone defeat certification." 753 F.Supp.2d 996, 1022 (N.D. Cal. 2010).

"But," *Harris* continued, "the Ninth Circuit has suggested that a relevant factor in the predominance analysis is whether damages calculations would be straightforward." *Id.* Certification was denied on this basis. "Determining the necessity of the variety of expenses incurred by [class members] appears to involve qualitative as well as quantitative analysis, not a 'straightforward calculation.'" *Id.* at 1022-23; *see also Norris-Wilson v. Delta-T Group, Inc.*, 270 F.R.D. 596, 610 (S.D. Cal. 2010) (denying certification because claimed expenses could not "be ascertained in one fell swoop," only by "a worker-by-worker, highly individual analysis"); *Morgan v. Wet Seal, Inc.*, 210 Cal.App.4th 1341, 1357 (2012) (affirming denial of certification where "proving the travel expense reimbursement claim would require numerous individual inquiries"). Class certification should be denied here too.

## C. Class Members Have Interests In Individually Controlling Their Claims.

Another aspect of Rule 23(b)(3) cannot be ignored. "While the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high," the Rule's drafters "had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court

at all." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (internal quotation marks omitted).

Here, class members stand to recover five- and even six-figure awards. ER56. With amounts like that at stake, class members have "interests in individually controlling the prosecution … of separate actions." Fed.R.Civ.P. 23(b)(3)(A). Class litigation is not a superior form of adjudication. *See Soares*, 320 F.R.D. at 485 (because named plaintiff "testified that his reimbursement claim alone is worth more than $200,000" and others' recoveries may be "significant," the "cost of the litigation does not favor class treatment").

## III. Expenses Incurred By A Claimant's Business, Not The Claimant Personally, Are Not Recoverable.

The District Court erred in one final respect. Although there is no decisional law "directly on point," ER64, the District Court nonetheless permitted five of the Claimants – Cohick, Yager, Bess, and the Gowans – to recover at trial expenses incurred by these Claimants' separately-incorporated preservation businesses, rather than by the five Claimants personally. California law does not permit such a recovery.

Business entities are treated as legally separate from their owners. *See Twenty-Nine Palms Enters. v. Bardos*, 210 Cal.App.4th

1435, 1450 (2012). That holds equally true here. As the District Court observed, "the parties have always read and treated the class member definition ('vendors') as being the owner of the business entity." ER70. It "concluded that the vendor-owners are employees under California law." ER64. It made no finding as to the employee status of any business entity. Yet the District Court nonetheless ruled that "FAS should not be permitted to avoid liability for its employees' necessary expenditure on its behalf by claiming that the vendor's business entity, not the vendor-owner, incurred FAS's business expenses." ER62.

That is inconsistent with the Labor Code's remedial provisions. The statute under which expenses are recoverable, Cal. Labor Code § 2802(a), requires an employer to indemnify its "employee" for "necessary expenses" incurred in "the discharge of his or her duties." An employer has no statutory obligation to reimburse expenses incurred by its employee's separate business. This is true in similar contexts. *See O'Connor v. Uber Technologies, Inc.*, 904 F.3d 1087, 1091 (9th Cir. 2018) (in employment-misclassification suit, noting that class definition excluded members "who contracted or were paid under corporate or fictitious names, out of concern that individualized issues would

predominate if they were included"); *Mitchell v. Franklin Bank, S.S.B.*, No. 05-1320, 2006 WL 4081216, at *2 (D. Minn. Dec. 29, 2006) (in class action seeking reimbursement of business expenses, because the named plaintiff (Mitchell) "used a limited liability company to incur operating expenses," the non-class member "limited liability company may seek reimbursement of the operating expenses, but Mitchell cannot").

Following plaintiffs' lead, the District Court focused on "broader policy considerations," rather than the operative statutory language. ER62. Policy considerations cannot carry the day here. There may be a "strong public policy favoring the indemnification of employees," ER63, but that policy is inapplicable in this context. Here, there are no "employees" to indemnify, only separately-incorporated businesses that happen to be owned by vendor-owners.

Ultimately, the District Court tried to skirt the issue, finding that "the jury listened to the evidence and concluded that the expenses were personally incurred by the claimants." ER64. But the jury did not conclude that, nor could it have. The five Claimants introduced and testified about tax records filed on behalf of their separate businesses. Their expense-related testimony was consistent with these records.

*See, e.g.*, ER208; 209-10; 214; 221; 226-30; 247-50; 264; 270-74; 277-81; 286; 298-99; 302-03; 305-08; 310-11.  For example, as the District Court wrote, the Gowans' "Pacific Shores Construction and Maintenance, Inc. was incorporated in 2009, and it incurred the business expenses reflected in the submitted evidence.  And Amy Gowan testified that the corporation incurred the expenses from 2010 to 2012."  ER63 (internal citations omitted).  There was simply no evidence that the expenses at issue came from the five Claimants' own pockets.  Judgment as a matter of law should have been granted in FAS's favor to that extent.

## CONCLUSION

The judgment in the Claimants' favor should be reversed or vacated, and the class certification should be vacated.

Dated: November 23, 2018          Respectfully submitted,

*/s/ Frank G. Burt*
Frank G. Burt

*Attorney for Defendants-Appellants*
*Field Asset Services, Inc. and*
*Field Asset Services, LLC*

## STATEMENT OF RELATED CASES

Defendants-appellants are unaware of any related case pending in this Court.

## CERTIFICATE OF COMPLIANCE
## FOR CASE NO. 18-16303

I certify that this brief complies with the type-volume limits permitted by Ninth Circuit Rule 32-1(a). The brief is 13,992 words, excluding the portions exempted by Ninth Circuit Rule 32-1(c) and Fed.R.App.P. 32(f). The brief's type-size and typeface comply with Fed.R.App.P. 32(a)(5) and (6).

*/s/ Frank G. Burt*
Frank G. Burt

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 23, 2018. I certify that all participants in the case who are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Frank G. Burt*
Frank G. Burt