*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

---

FRED BOWERMAN; JULIA BOWERMAN,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellees,*

v.

FIELD ASSET SERVICES, INC.; FIELD ASSET SERVICES, LLC,
*Defendants-Appellants.*

---

*On Appeal from the United States District Court for the Northern District of California,*
*Case No. 3:13-cv-00057-WHO · Honorable William H. Orrick*

## APPELLANTS' REPLY BRIEF

LITTLER MENDELSON, P.C.
ROBERT G. HULTENG
333 Bush Street, 34th Floor
San Francisco, California 94104
(415) 433-1940 Telephone

LITTLER MENDELSON, P.C.
BARRETT K. GREEN
2049 Century Park East, 5th Floor
Los Angeles, California 90067
(310) 553-0308 Telephone

DRINKER BIDDLE & REATH LLP
FRANK G. BURT
BRIAN P. PERRYMAN
1500 K Street N.W.
Suite 1100
Washington, DC 20005-1209
(202) 842-8800 Telephone

*Attorneys for Defendants-Appellants*
*Field Asset Services, Inc., and Field Asset Services, LLC*

 

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................1

ARGUMENT .........................................................................3

    I.    Summary Judgment Was Erroneous .....................3

        A.    *Borello*, Not *Dynamex*, Governs Here ...........3

            1.    Expense-reimbursement claims.........................3

            2.    Joint-employment cases ......................6

        B.    Triable Issues Exist Under The *Borello* Test ..............8

            1.    Right-to-control factor ........................8

            2.    Secondary factors...............................16

        C.    Triable Issues Exist Under The *Dynamex* Test ...................19

            1.    Part A ...............................................19

            2.    Part B ...............................................19

            3.    Part C ...............................................23

    II.    No Class Should Have Been Certified ................27

        A.    Adjudicating The Relevant Factors Requires Evaluating Disparate Experiences And Evidence .................................................27

B. No Common Evidence Exists To Prove Overtime Hours Worked Or Reimbursable Expenses Incurred ........................................................ 31

III. Expenses Incurred By A Claimant's Business, Not The Claimant Personally, Are Not Recoverable ............................................................ 34

CONCLUSION ........................................................ 37

CERTIFICATE OF COMPLIANCE FOR CASE NO. 18-16303 ........................................................ 38

CERTIFICATE OF SERVICE ........................................................ 39

# TABLE OF AUTHORITIES

**Federal Cases**                                                    **Page(s)**

*Bowman v. CMG Mortgage Inc.*,
    No. 07-3140, 2008 WL 3200662 (N.D. Cal. Aug. 4, 2008) ............... 35

*Brown v. Luster*,
    165 F.2d 181 (9th Cir. 1947) ............................................................. 13

*Cotter v. Lyft, Inc.*,
    60 F.Supp.3d 1067 (N.D. Cal. 2015) .......................................... 12, 17

*Cummings v. Connell*,
    402 F.3d 936 (9th Cir. 2005) ............................................................. 14

*Doe I v. Wal-Mart Stores, Inc.*,
    572 F.3d 677 (9th Cir. 2009) ...................................................... 10, 15

*Doyle v. Chrysler Group, LLC*,
    663 F.App'x 576 (9th Cir. 2016) ...................................................... 32

*Harris v. Vector Marketing Corp.*,
    753 F.Supp.2d 996 (N.D. Cal. 2010) ................................... 32, 33, 34

*Hennighan v. Insphere Insurance Solutions, Inc.*,
    38 F.Supp.3d 1083 (N.D. Cal. 2014) ................................................ 14

*Jones v. Royal Administration Services, Inc.*,
    887 F.3d 443 (9th Cir. 2018) ............................................................. 12

*Lawson v. Grubhub, Inc.*,
    302 F.Supp.3d 1071 (N.D. Cal. 2018) ...................................... 11, 15

*Leyva v. Medline Industries Inc.*,
    716 F.3d 510 (9th Cir. 2013) ............................................................. 32

*McLeod v. Field Asset Services, LLC,*
   No. 15-645, 2017 WL 338002 (S.D. Ala. Jan. 30, 2017)..........8, 9, 10

*Narayan v. EGL, Inc.,*
   616 F.3d 895 (9th Cir. 2010) .............................................................8

*Narayan v. EGL, Inc.,*
   285 F.R.D. 473 (N.D. Cal. 2012) .....................................................30

*Norris-Wilson v. Delta-T Group, Inc.,*
   270 F.R.D. 596 (S.D. Cal. 2010)...............................................32, 33

*Ruiz v. Affinity Logistics Corp.,*
   754 F.3d 1093 (9th Cir. 2014) ........................................................15

*Swamy v. Title Source, Inc.,*
   No. 17-1175, 2018 WL 1586139 (N.D. Cal. Apr. 2, 2018) ...............32

*Tyson Foods, Inc. v. Bouaphakeo,*
   136 S.Ct. 1036 (2016) ...............................................................31, 36

*Valadez v. CSX Intermodal Terminals, Inc.,*
   298 F.Supp.3d 1254 (N.D. Cal. 2018)............................................16

*Vondersaar v. Starbucks Corp.,*
   719 F.App'x 657 (9th Cir. 2018).......................................................4

**State Cases**

*Arnold v. Mutual of Omaha Insurance Co.,*
   202 Cal.App.4th 580 (2011) .............................................................4

*Arzate v. Bridge Terminal Transportation, Inc.,*
   192 Cal.App.4th 419 (2011) ...........................................................17

*Ayala v. Antelope Valley Newspapers, Inc.,*
   59 Cal.4th 522 (2014) ....................................................................13

*Barbosa v. IMPCO Technologies, Inc.*,
179 Cal.App.4th 1116 (2009) ........................................................ 6

*Beaumont-Jacques v. Farmers Group, Inc.*,
217 Cal.App.4th 1138 (2013) ............................................... 10, 13, 14

*Bowman v. Wyatt*,
186 Cal.App.4th 286 (2010) ........................................................ 17

*Cochran v. Schwan's Home Service, Inc.*,
228 Cal.App.4th 1137 (2014) ................................................... 35, 36

*Coverall North America v. Commissioner, Division of Unemployment Assistance*,
447 Mass. 852 (2006)........................................................... 24, 25

*Curry v. Equilon Enterprises*,
23 Cal.App.5th 289 (2018) ........................................................ 7, 22

*Duffey v. Tender Heart Home Care Agency, LLC*,
31 Cal.App.5th 232 (2019) .......................................................... 23

*Dynamex Operations West, Inc. v. Superior Court*,
4 Cal.5th 903 (2018) ...................................... 1, 3, 5, 19, 22, 24, 25, 26

*Elijahjuan v. Superior Court*,
210 Cal.App.4th 15 (2012) .......................................................... 11

*Espejo v. The Copley Press, Inc.*,
13 Cal.App.5th 329 (2017) .......................................................... 36

*Garcia v. Border Transportation Group, LLC*,
28 Cal.App.5th 558 (2018) ...................................................... 4, 5, 6

*Gattuso v. Harte-Hanks Shoppers, Inc.*,
42 Cal.4th 554 (2007) ............................................................... 5

*Linton v. Desoto Cab Co.*,
    15 Cal.App.5th 1208 (2017) ............................................................ 16

*Morgan v. Wet Seal, Inc.*,
    210 Cal.App.4th 1341 (2012) ................................................ 32, 33, 34

*Sebago v. Boston Cab Dispatch, Inc.*,
    471 Mass. 321 (2015) ............................................................ 20, 21, 22

*S.G. Borello & Sons v. Department of Industrial Relations*,
    48 Cal.3d 341 (1989) ............................................................ 2, 8, 15, 17

*Southwest Appraisal Group, LLC v. Administrator,*
    *Unemployment Compensation Act*, 324 Conn. 822 (2017) .............. 25

*State Compensation Insurance Fund v. Brown*,
    32 Cal.App.4th 188 (1995) .............................................................. 17

*Thurman v. Bayshore Transit Management, Inc.*,
    203 Cal.App.4th 1112 (2012) ............................................................ 4

## State Rules

Cal. Code Regs., tit. 8, § 11160 ................................................................ 4

## State Statutes

Cal. Labor Code § 2802 ....................................................... 1, 3, 4, 5, 34, 36

## Other Authorities

Restatement (Third) of Agency § 1.01 (2006) ......................................... 10

# INTRODUCTION

FAS did not misclassify property preservation vendor-owners as independent contractors.  To be sure, Claimants cite selective, anecdotal evidence of purported misclassification, but ignore or downplay FAS's conflicting evidence.  Claimants remain unable to show that no juror could reasonably disagree based on the total mix of available evidence.  That inability is underscored by the fact that another federal court – applying a "control" test indistinguishable from California's – granted summary judgment to FAS on the issue of whether FAS is its vendor's employer.  If judges can draw competing inferences, so can jurors.

Evidently recognizing the futility of defending the rulings below, Claimants instead wager heavily on the "ABC" test minted in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal.5th 903 (2018).  *Dynamex*, however, was never intended to apply to situations of joint employment, where the alleged employee (the vendor-owner) is already an employee of a primary employer (the vendor) and the issue is whether he or she is also employed by another (FAS).  And *Dynamex* certainly does not apply to expense-reimbursement claims which are not premised on any wage order.  Those claims arise, if at all, from Cal. Labor Code § 2802, which

is governed by the "economic realities" test articulated in *S.G. Borello & Sons v. Department of Industrial Relations*, 48 Cal.3d 341 (1989).[1]

Summary judgment would be inappropriate under the ABC test anyway. Competing inferences and evidence exist as to FAS's supposed right to control vendors, negating the "A" factor. FAS neither performs preservation services nor depends upon vendors' revenues to support its business, negating the "B" factor. And vendors operated independent, entrepreneurial businesses, negating the "C" factor.

Claimants' arguments in favor of class certification fare no better. They do not defend the District Court's stated justification for certification – that the class definition excludes those who spent less than 70 percent of their time working for FAS – and instead return to *Dynamex*. Even if *Dynamex* applies, certification remains improper under the "A" factor (there is no common evidence of control) and "C" factor (vendors varied in the extent to which they operated independent businesses). Certification also is improper under the "B" factor because, at a class trial, damages could not be proved "feasibly and efficiently," only through disputed plaintiff-by-plaintiff testimony.

---

[1] There also is the question of whether *Dynamex* applies retroactively. That question will be decided in appeals pending elsewhere.

Finally, Claimants argue that five of them were properly awarded expense-reimbursement damages although the expenses were actually paid by their separately-incorporated businesses. That runs counter to the principle of corporate distinctiveness. And while employers who pass on costs might not avoid § 2802 *liability*, whether *damages* should be awarded to uninjured employees raises entirely different issues.

## ARGUMENT

## I. Summary Judgment Was Erroneous.

### A. *Borello*, Not *Dynamex*, Governs Here.

Claimants believe that *Dynamex*'s ABC test governs this case. They are mistaken.

#### 1. Expense-reimbursement claims.

Claimants' error is perhaps most apparent in the attempt to superimpose *Dynamex* on their § 2802 expense-reimbursement claims. *Dynamex* expressly declined to decide whether either the *Borello* test or the "wage order definitions" apply to that statute. 4 Cal.5th at 916 n.5. Section 2802, however, does not define who is an "employee." Where "a statute refers to an 'employee' without defining the term, courts have generally applied [*Borello*'s] common law test of employment to that

statute." *Arnold v. Mut. of Omaha Ins. Co.*, 202 Cal.App.4th 580, 586 (2011). Because "the Labor Code does *not* expressly define 'employee' for purposes of Labor Code section 2802," courts before and after *Dynamex* have held that "the common law test of employment applies to that section" and other non-wage-order claims. *Id.*; *see also Garcia v. Border Transp. Group, LLC*, 28 Cal.App.5th 558, 570-71 (2018).

Claimants argue that their expense-reimbursement claims really arise under Wage Order 16-2001, Cal. Code Regs., tit. 8, § 11160, which was briefly mentioned in class certification briefing, not the pleadings. Claimants' Br. at 32-33. This theory arrives too late. *See Vondersaar v. Starbucks Corp.*, 719 F.App'x 657, 658 & n.2 (9th Cir. 2018). Yet even if it had been properly raised below, Wage Order 16-2001 cannot supply the basis for the claims. California's wage orders do not afford litigants private rights of action, *Thurman v. Bayshore Transit Mgmt., Inc.*, 203 Cal.App.4th 1112, 1132 (2012), and are no substitute for § 2802 itself.

Wage Order 16-2001 only requires an employer's provision of "tools and equipment" anyway, not the other expenses Claimants recovered at trial, *i.e.*, insurance, cellphone charges, dump fees, and mileage/fuel. *See Garcia*, 28 Cal.App.5th at 571 ("*non*-wage-order

claims" include "claims for reimbursement of fuel or tolls under Labor Code, section 2802").  Moreover, by its terms, the Wage Order does "not apply to persons employed in administrative, executive, or professional capacities."  Claimants are vendor-*owners*, and many were "employed," at least some of the time, in these "capacities."

Claimants further argue that the ABC test now applies to *all* Labor Code provisions having a "remedial purpose."  Claimants' Br. at 33.  "There is no reason to apply the ABC test categorically to every working relationship," however, "particularly when *Borello* appears to remain the standard for worker's compensation," *Garcia*, 28 Cal.App.5th at 570, which has its own remedial purposes.  Indeed, "wages and expense reimbursement are conceptually distinct and subject to different statutory … constraints."  *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal.4th 554, 572 (2007).  Unlike § 2802, "wage orders regulate very *basic* working conditions for covered California employees, thus warranting 'the broadest definition' of employment to extend protections to 'the widest class of workers.'"  *Garcia*, 28 Cal.App.5th at 571 (quoting *Dynamex*, 4 Cal.5th at 913, 951).  Furthermore, unlike § 2802, wage orders "concern not only the health

and welfare of the workers themselves, but also the public health and general welfare. One purpose of requiring payment of overtime wages is to spread employment throughout the work force by putting financial pressure on the employer." *Barbosa v. IMPCO Techs., Inc.*, 179 Cal.App.4th 1116, 1122 (2009) (cleaned up).

Nor is it "nonsensical," as Claimants suggest, Claimants' Br. at 33, to apply or withhold the ABC test flexibly. "To the contrary, the Supreme Court recognized that different standards could apply to different statutory claims." *Garcia*, 28 Cal.App.5th at 570. Under *Arnold* and *Garcia*, therefore, this *Erie*-bound Court should continue to apply the *Borello* test to Claimants' expense-reimbursement claims.[2]

### 2. Joint-employment cases.

*Dynamex* does not apply to *any* of the claims here. This case involves a joint-employment arrangement: Claimants argue that they are FAS employees and do not dispute that they are employees of their own preservation businesses. Although Claimants observe that they are not asserting claims based on joint-employment theories, Claimants' Br. at 30-31, that misses the point.

---

[2] Claimants rely on a contrary Superior Court decision, Claimants' Br. at 34, but that nonprecedential decision was issued pre-*Garcia*.

The ABC test "is meant to serve policy goals that are not relevant in the joint employment context." *Curry v. Equilon Enters.*, 23 Cal.App.5th 289, 314 (2018). In that context, "the primary employer is presumably paying taxes and the employee is afforded legal protections due to being an employee of the primary employer. As a result, the policy purpose for presuming the worker to be an employee and requiring the secondary employer to disprove the worker's status as an employee is unnecessary in that taxes are being paid and the worker has employment protections." *Id.* at 313-14. "Therefore, it does not appear that the Supreme Court intended for the 'ABC' test to be applied in joint employment cases." *Id.* at 314.

The "policy goals" animating *Dynamex* are absent from this case. True, the claims here are for misclassification (to which *Dynamex* might ordinarily apply) and are not strictly premised on joint-employment theories. But this case *does* involve a joint-employment arrangement, distinguishing it from run-of-the-mill misclassification cases. Vendors were Claimants' primary employers, ensuring "that taxes are being paid and the worker has employment protections." *Id.* *Borello*, not *Dynamex*, should therefore govern.

**B.    Triable Issues Exist Under The *Borello* Test.**

*Borello* cannot be avoided.  And this is not the "rare case" where the *Borello* factors "point with unanimity" to employee status.  *Narayan v. EGL, Inc.*, 616 F.3d 895, 901 (9th Cir. 2010).

**1.    Right-to-control factor.**

That is true of the right-to-control factor.  Another federal court found on summary judgment that FAS *lacked* the right to control its vendor, an independent contractor.  *McLeod v. Field Asset Servs., LLC*, No. 15-645, 2017 WL 338002, at *4-5 (S.D. Ala. Jan. 30, 2017).  Claimants proclaim that *McLeod* "applies *Alabama law*," Claimants' Br. at 43, but do not explain how or why that matters here.  In fact, Alabama's test is indistinguishable from *Borello*'s.  "The test for determining whether a person is an agent or employee of another, rather than an independent contractor, is whether that other person has reserved the right of control over the means and method by which the person's work will be performed, whether or not the right of control is actually exercised."  2017 WL 338002, at *5; *cf. Borello*, 48 Cal.3d at 350.  Under this test, FAS's vendor "was an independent contractor and

FAS did not reserve the right of control over the means and method by which [the] work was performed." 2017 WL 338002, at *6.

Claimants further assert that "documents confirm" FAS's control in certain enumerated respects. Claimants' Br. at 40-41. The full record belies Claimants' selective evidence and California law belies the inferences Claimants draw from that evidence. Consider:

*Client negotiations.* FAS's supposed right to control contracts and pricing between itself and its clients has little bearing on any putative right to control the manner or means of vendors' work. Equally important, vendors in turn negotiated with FAS, often successfully, over pricing and terms. FAS Br. at 6-9, 32-33.

*Work assignments/reassignments.* FAS does not control workers' schedules. *Id.* at 5-6, 41-42. Not only are vendors free to decline work orders, they often did, including if they were too busy or the work was outside the agreed coverage area. *Id.* at 9, 33.

*Work performance.* FAS does not control how work is performed or who performs it, and monitors for compliance with government- and client-mandated specifications. *Id.* at 4-6, 9-11, 34-41. That does not suggest employee status. An employer of an independent contractor

may retain an interest in the manner in which the work is performed without altering the relationship. *Id.* at 34-35 (citing *Beaumont-Jacques v. Farmers Group, Inc.*, 217 Cal.App.4th 1138, 1143 (2013)).

*Liability for breach.* Enforcing compliance with contractual obligations, including by imposing liability for breaches, "does not mean that the service recipient has an interim right to give instructions to the provider." Restatement (Third) of Agency § 1.01 cmt. f (2006). A business must be free to impose conditions for acceptable work results.

*Photographs.* Photographic requirements arise from government- and client-mandated specifications. FAS Br. at 10-11. Regardless, "FAS … reviewing photographs of work, *etc.* … is not tantamount to *controlling* [the] work or *how* [vendors] performed the work." *McLeod*, 2017 WL 338002, at *5.

*Inspections.* Site inspections involve only a small percentage of volume, FAS Br. at 6, and ensure that work is completed, not dictate how it is performed. *Id.* at 6, 39 (citing *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 683 (9th Cir. 2009); *McLeod*, 2017 WL 338002, at *5).

*Invoice deadlines.* Deadlines to submit vendor invoices have nothing to do with FAS's purported right to control the manner or

means of vendors' work. Moreover, Claimants' evidence is not common across the class. Many VQPs provide that payment may be "delayed," not denied, if invoices are submitted late. ER469; 484. Only *some* VQPs give 24-hour deadlines; even then, invoices may be negotiated to be submitted post-deadline. SER2203; 2258.

*Insurance.* FAS requiring that vendors carry their own liability insurance actually supports finding independent contractorship. For example, it demonstrates awareness that vendors would not be covered as employees under FAS policies. *See Elijahjuan v. Superior Court*, 210 Cal.App.4th 15, 32 (2012) (that putative employer required plaintiffs to maintain their own insurance is "indicia of an independent contractor, rather than employment relationship").

*Background checks.* Worker screening is not evidence of a right to control the manner or means of work because FAS lacks control over which workers vendors ultimately use. FAS Br. at 41 (citing *Lawson v. Grubhub, Inc.*, 302 F.Supp.3d 1071, 1084 (N.D. Cal. 2018)).

*Volume- and performance-based tracking and discipline.* Vendor "scorecards" containing performance metrics were simply a quantitative tool for vendors to manage their businesses and were discontinued in

2012. *Id.* at 38-39. Furthermore, there was counter-evidence, including class member testimony, that FAS does *not* discipline vendors based on low volume. *Id.* at 9; *see also Cotter v. Lyft, Inc.*, 60 F.Supp.3d 1067, 1079-81 (N.D. Cal. 2015) ("the record precludes a summary judgment ruling in favor of the plaintiffs" notwithstanding finding that "Lyft reserves the right to penalize (or even terminate) drivers who don't follow" Lyft's instructions).

*Training.* Conflicting evidence was presented about training. Some vendors were never offered *any* training. FAS Br. at 43. Moreover, the training concerned vendors' interactions with FAS, not improvement of property preservation skills. *Id.* Required attendance at periodic training does not indicate employee status anyway. *See Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 452 (9th Cir. 2018) (putative principal "provided some training and oversight" at call center, but "did not directly supervise" calls, suggesting that "telemarketers were not subject to the requisite level of control").

In addition to touting their own so-called "proof," Claimants attack FAS's control-related evidence. Claimants' attacks lack merit:

1.    Claimants concede that the vendor-vendee label in the VQPs signals independent contractorship, but cavil that labels are "not dispositive."   Claimants' Br. at 44.   FAS never argued otherwise, observing only that the parties' contractual characterization of their relationship is "a significant factor" and "necessary starting point" that was treated dismissively below.  FAS Br. at 29.  Claimants assert that "FAS relies on cases that pre-date this rule from *Borello*, or are from other jurisdictions," Claimants' Br. at 44, but both of FAS's quotes are found in *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal.4th 522, 534-35 (2014), a post-*Borello* California Supreme Court decision.   The parties' self-descriptions merit "significant" weight.

2.    Claimants concede that many VQPs had mutual termination provisions, but argue that such provisions – and VQPs lacking termination provisions (the functional equivalent of mutuality, *see Brown v. Luster*, 165 F.2d 181, 185 (9th Cir. 1947)) – suggest control rights.  Claimants' Br. at 44-45.  The cases Claimants cite, however, do not concern mutual termination provisions.  One case, *Narayan*, *supra*, comes the closest, but antedates *Beaumont-Jacques*, *supra*, which squarely holds that "mutuality augurs against" employee status.  217

Cal.App.4th at 1147; *see also Hennighan v. Insphere Ins. Solutions, Inc.*, 38 F.Supp.3d 1083, 1105 (N.D. Cal. 2014) ("A mutual termination clause is evidence of an independent-contractor relationship.").

3.    Claimants argue that FAS "simply overstates" evidence that vendors regularly and successfully negotiated pricing and other terms. Claimants' Br. at 45-46.  Yet not even the District Court doubted that vendors negotiated with FAS.   ER102; 162.   As one example, FAS showed that *the named plaintiff* successfully negotiated multiple rates. FAS Br. at 32.  The named plaintiff's experience is supposedly "typical" of the class, including Claimants.   Indeed, "a class representative functions as a stand-in for the entire class."  *Cummings v. Connell*, 402 F.3d 936, 944 (9th Cir. 2005).

For their part, Claimants are less than scrupulous in documenting their assertion that vendors "have no meaningful ability to negotiate their wages or working conditions."   Claimants' Br. at 8.   Many of Claimants' record citations are irrelevant or contradictory.  *E.g.*, SER1116-19 (trash-outs negotiated); SER1190 (trip fees sometimes negotiated); SER1243-44 (price fluctuated based on negotiations).  So, too, with Claimants' assertion that there is "no meaningful opportunity

to modify" VQPs. Claimants' Br. at 7. Their record tells a different story. *E.g.*, SER2073-74 (although FAS witness lacked vendor-specific recollection, "there are certainly sections within the vendor packet that are more commonly negotiated," including bid submissions).

Ultimately, Claimants dismiss negotiations as "immaterial" because, they say, it "only highlight[s] FAS's ability to exert control over Workers' pay." Claimants' Br. at 46. Claimants are incorrect. The ability to "negotiate for higher rates" clearly evinces independent contractorship. *See Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1101 (9th Cir. 2014); *Lawson*, 302 F.Supp.3d at 1086. Unlike in *Borello*, here there is a "real choice of terms." 48 Cal.3d at 359.

4.   Claimants emphasize that FAS supposedly "required workers to respond to work order assignments within 24 hours and complete them within three days." Claimants' Br. at 46. Completion deadlines are not evidence of a right to control work performance. FAS Br. at 42-43. Deadlines are "common buyer-seller contract terms" and do not "direct the daily work activity." *Doe I*, 572 F.3d at 683.

5.   Claimants argue that requiring workers to comply with government-mandated rules (like photography requirements) may be

"*included*" as evidence of control. Claimants' Br. at 48. Untrue. "A putative employer does not exercise any degree of control merely by imposing requirements mandated by government regulation." *Linton v. Desoto Cab Co.*, 15 Cal.App.5th 1208, 1223 (2017). Claimants' cases antedate *Linton* and were not followed for this reason in *Valadez v. CSX Intermodal Terminals, Inc.*, 298 F.Supp.3d 1254, 1281 (N.D. Cal. 2018).

Although Claimants are correct that FAS's requirements may sometimes extend beyond government rules, Claimants' Br. at 49, Claimants ignore that "a reasonable jury could also infer that Defendant's policies, *even the ones that exceed the exact requirements set out in the regulations*, do not evince significant control because they are designed to implement the regulations' more general direction" of ensuring that vendors "are meeting the regulations." *Valadez*, 298 F.Supp.3d at 1282 (emphasis added). Drawing such inferences demands nuanced analyses ill-suited to summary judgment.

## 2. Secondary factors.

*Borello*'s secondary factors also preclude summary judgment. In Claimants' view, "an employer's right to control establishes the employment relationship" and the secondary factors barely register.

Claimants' Br. at 38-39.  That turns *Borello* on its head.  *Borello* teaches "that the 'control' test, applied rigidly and in isolation, is often of little use" in evaluating employee status.  48 Cal.3d at 350.

"Right of control retains significance [post-*Borello*], but is no longer determinative." *State Comp. Ins. Fund v. Brown*, 32 Cal.App.4th 188, 202 (1995); *see also Bowman v. Wyatt*, 186 Cal.App.4th 286, 301-03 (2010) (right-to-control factor not dispositive; secondary factors "must be considered").  Courts deny summary judgment even where the right-to-control factor favors the movant.  *See Cotter*, 60 F.Supp.3d at 1079, 1081 ("the record precludes a summary judgment ruling in favor of the plaintiffs" although right-to-control factor "cut" in plaintiff-movants' favor); *Arzate v. Bridge Terminal Transp., Inc.*, 192 Cal.App.4th 419, 427 (2011) (reversing summary judgment where, although right-to-control factor favored defendant-movant, secondary factors did not).

The District Court found that four secondary factors – the parties' intents, opportunity for profit or loss, employment of assistants, and payment method – *favor FAS*.  ER110-11.  FAS addressed other factors – *e.g.*, regular part of business, distinct occupation or business – in its

opening brief, FAS Br. at 45-51, and will return to the considerations underlying those factors in discussing *Dynamex* below.

Regarding *Borello*'s degree-of-permanence factor, Claimants concede that vendors are not bound to serve only FAS but argue that the class definition's 70-percent threshold means class members are, invariably, "dependent on FAS and unable to practically perform work for others." Claimants' Br. at 51. This assumption is facile. A better assumption is that class members *preferred* to work for FAS. Indeed, the exclusion of vendors who worked *less* than 70 percent of the time for FAS proves that vendor preferences varied. Equally important, neither the District Court nor Claimants ever addressed the length of time each class member worked for FAS more than 70 percent of the time. Was it one month? One year? One decade? Each relationship's duration bears directly on questions of "permanence" and "dependence," yet neither the District Court nor Claimants bothered with that analysis.

Another secondary factor merits mention. FAS does not supply vendors' worksites; it routes vendors to client-owned properties. Claimants believe this is "nonsensical," *id.* at 50, but their own logic leads to outlandish results – every business would "supply the worksite"

merely by sending independent contractors out into the world. Claimants' other argument, regarding tools and equipment, is equally flawed. FAS "requires" vendors to supply the tools, Claimants say. *Id.* at 50-51. But *Borello* asks *who* supplied the tools, not the *reason* they were supplied. Businesses commonly "require" independent contractors to supply tools; that does not suggest the businesses are employers.

## C. Triable Issues Exist Under The *Dynamex* Test.

### 1. Part A.

The *Dynamex* ABC test does not apply, but offers no basis for summary judgment even if it does. "Part A of the test mirrors *Borello*," Claimants assert, *id.* at 25, sweeping in all the triable issues that make summary judgment inappropriate under *Borello*.

### 2. Part B.

The "B" and "C" factors are equally unsuitable for summary judgment. The "B" factor asks: "Does the worker perform work that is outside the usual course of the hiring entity's business?" *Dynamex*, 4 Cal.5th at 959. California's "version" of this factor is "consistent with" the "Massachusetts version of part B." *Id.* at 956 n.23.

The Supreme Judicial Court of Massachusetts applied part B in *Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321 (2015). There, plaintiff-drivers leased taxicabs and taxicab medallions from medallion owners and received ride-matching services from radio dispatch associations. *Id.* at 325. The drivers sued the medallion owners and dispatchers for misclassification. *Id.* at 326. The trial court denied defendants' summary judgment motions. *Id.*

That ruling was vacated on appeal. Among other things, the defendants satisfied part B. *Id.* at 333-36. Medallion owners defined their business as "leasing taxicabs, managing the leasing of taxicabs, providing taxicab dispatch services, and providing limousine services." *Id.* at 335. They did not transport passengers. *Id.* Consequently, drivers "did not provide services in the ordinary course of the medallion owners' business, *i.e.*, the leasing of taxicabs and medallions." *Id.* Medallion owners, moreover, were unconcerned with drivers' financial results, "as drivers are not required to remit a percentage of their revenues, which include both fares and tips." *Id.* at 334.

Likewise, drivers were not in the dispatchers' business, notwithstanding that dispatchers "advertise themselves as providing

taxicab services" and "arrange for the transportation of passengers." *Id.* at 335. Such facts cannot "override the realities" of dispatchers' "actual business operations." *Id.* Nor did it matter that dispatchers profited by "creat[ing] a base of customers" for drivers; that benefit is "incidental to the ordinary course of the radio associations' business of selling dispatch services." *Id.* at 336. In short, "the transportation of passengers for fares is not in the ordinary course of either the medallion owners' or radio associations' businesses." *Id.*

Against *Sebago*'s backdrop, it is apparent why Claimants' "B" factor-related arguments fail. Initially, Claimants assert that FAS "holds itself out" as a property preservation company and advertises that FAS will "'handle every detail of the vendor relationship' and 'measure every vendor on every step of every job.'" Claimants' Br. at 35. Like in *Sebago*, however, advertising cannot "override the realities" of FAS's "actual business operations." 471 Mass. at 335. FAS does not provide property preservation services. Vendors do. Moreover, in the same way that medallion owners and dispatchers do not transport passengers even if they "arrange for the transportation of passengers," *id.* at 335-36, the fact that FAS "handles" vendor relationships and

ensures compliance with client specifications does not mean FAS mows lawns, repairs roofs, or performs the other tasks vendors perform.

Claimants' other point – that vendors are "the backbone of FAS's business," Claimants' Br. at 35 – is simplistic. The same could be said of drivers, who are the "backbone" of the taxicab business and without whom medallion owners and dispatchers could not operate, *see Sebago*, 471 Mass. at 335; or gas station managers, who are the "backbone" of gas retailing and without whom gas station owners could not operate, *see Curry*, 23 Cal.App.5th at 315. Their interdependent relationships notwithstanding, these actors have been held to "perform work that is outside the usual course of the hiring entity's business." *Dynamex*, 4 Cal.5th at 959.

So too here. FAS does not do the same things vendors do. It has distinct skills, operations, and equipment. Moreover, like medallion owners in *Sebago*, FAS is unconcerned with the financial results of vendors' operations, as vendors do not remit any of their revenues to FAS. *See* 471 Mass. at 335. The relationship is simply "that of buyer and seller." *Id.* at 334.

Claimants conclude their discussion of the "B" factor by returning to *Dynamex*'s example of cake decorators and bakeries. "By FAS's definition," Claimants contend, "bakers would not be engaged in the regular business of a bakery because a bakery only coordinates the completion of baked goods for its clients." Claimants' Br. at 35-36 (alterations omitted). Claimants' critique fails because, whereas a bakery actually *bakes*, FAS does not actually service properties. One would expect to find spatulas and cake decorators at a bakery, but will search in vain for lawnmowers or general contractors at FAS. Thus, while it is convoluted – even "absurd," *id.* at 35 – to think of a bakery's business as "coordinating" baking, it is natural to think of FAS's business as "coordinating" property preservation.[3]

### 3.    Part C.

FAS also satisfies the "C" factor. That factor asks: "Is the worker customarily engaged in an independently established trade, occupation,

---

[3] Claimants also rely on *Duffey v. Tender Heart Home Care Agency, LLC*, 31 Cal.App.5th 232 (2019), which opined that caregivers formed a "regular and integrated portion" of a caregiver-placement agency's business. Not only did *Duffey* apply *Borello* (not *Dynamex*), it merely concluded this "established a dispute of fact" precluding summary adjudication for the agency. *Id.* at 258. *Duffey* is consistent with FAS's larger point that jurors could reasonably differ here too.

or business of the same nature as the work performed for the hiring entity?" *Dynamex*, 4 Cal.5 at 961. An independent contractor is one "who *independently* has made the decision to go into business for himself or herself." *Id.* at 962. "Such an individual generally takes the usual steps to establish and promote his or her independent business – for example, through incorporation, licensure, advertisements, routine offerings to provide the services of the independent business to the public or to a number of potential customers, and the like." *Id.*

Citing *Coverall North America v. Commissioner, Division of Unemployment Assistance*, 447 Mass. 852 (2006), Claimants argue that, like the *franchised* janitorial businesses in *Coverall*, vendors were "required to wear the 'hat' of FAS when performing services for FAS's customers." Claimants' Br. at 37. The analogy is inapt – franchises are necessarily born of relationships with the franchisor, and necessarily end at the relationship's conclusion. In between, franchisees follow a common business plan and cultivate a common customer base. Few would describe franchises as "independently" established or operated.

By contrast, the vendors are not franchisees, and were not born of relationships with FAS. Many existed before and/or after relationships

with FAS. Vendors are separately licensed, officed, equipped, branded, and marketed. (Claimants argue that "licensing" is "irrelevant" because it "is not required for FAS's work," *id.* at 51, but that *proves* licensed vendors' independence. Why else bother obtaining licenses?) Vendors established their own territories, hired, fired, and managed their own staff, and were free to (and did) work for FAS competitors and others. FAS Br. at 7, 11-15, 48-51. The entrepreneurial nature of vendors' business is undeniable – "it is clear that opportunity for profit exists." ER111. And, unlike franchisees, "growth of [a vendor's] own business" does not "inevitably expand[]" FAS's "clientele base." 447 Mass. at 859.[4]

The vendors are more akin to the automotive repair appraisers in *Southwest Appraisal Group, LLC v. Administrator, Unemployment Compensation Act*, 324 Conn. 822 (2017), which *Dynamex* used to illustrate the "C" factor. 4 Cal.5th at 963 n.31. In *Southwest Appraisal*, *Dynamex* explained, an "administrative agency erred in determining that [the] hiring entity failed to establish that auto repair appraisers were customarily engaged in an independently established

---

[4] Claimants' argument that vendors are not "full-fledged businesses" because FAS "told" vendors to govern themselves as "full-fledged businesses" is incoherent. Claimants' Br. at 37. The relevant question is *whether* vendors operated independently, not *why* they did so.

business based solely on the lack of evidence that [the] appraisers had actually worked for other businesses, where [the] appraisers had obtained their own independent licenses, possessed their own home offices, provided their own equipment, printed their own business cards, and sought work from other companies." *Id.*

Claimant Matthew Cohick and his company (Monster Mowers) exemplify the point. Cohick started Monster Mowers in 2003 as a business dedicated to landscaping services. ER79. At that time, Cohick worked for homeowners and operated Monster Mowers with a truck, lawnmower, weedwhacker, leafblower, and chainsaw. *Id.* The company began servicing properties for FAS in 2006. *Id.* Between 2006 and 2014, Monster Mowers employed up to 30 people, and used up to 30 subcontractors. ER80. Throughout its existence, Monster Mowers ran an advertisement having "nothing to do with" preservation work. *Id.* The advertisement concerned landscaping services, and targeted homeowners. *Id.* Monster Mowers invested heavily in company-branded apparel. ER412; 452. It operated from Cohick's home and obtained a general contractors license in 2011. ER80. During 2012 and 2013, Monster Mowers also worked for an FAS competitor. *Id.*

Cohick's circumstances may not be representative of others' circumstances, but that is the point. Classwide summary judgment was improper under *Borello*, and remains improper under *Dynamex*.

## II. No Class Should Have Been Certified.

Because common evidence does not exist, class certification was also improper. This is true under either the *Borello* or *Dynamex* tests.

### A. Adjudicating The Relevant Factors Requires Evaluating Disparate Experiences And Evidence.

Claimants argue that certification was proper under *Borello* and *Dynamex*'s "A" factor because "common evidence demonstrates that FAS retained and exercised 'all necessary control' over the Class through its uniform contracts, policies and practices." Claimants' Br. at 55. FAS has shown, however, that VQPs differed materially across the class (different provisions characterizing the relationship, termination provisions, negotiated rates, invoice deadlines), FAS Br. at 6-9, 61, as did vendors' traits and circumstances (different bargaining leverage, workforces, self-investment, marketing). *Id.* at 11-15, 61-62. Further, so-called "common evidence" of control (*e.g.*, job specifications, completion deadlines, insurance, photographs, inspections) is illusory. It is either evidence of nothing at all or favors FAS. *Id.* at 34-42.

Even the District Court ruled that it never would have certified a class but for a modification to the original class definition: the exclusion of vendors who spent less than 70 percent of their time working for FAS. ER133-38. The District Court earlier *denied* certification because of the "substantial variation in the extent to which FAS has a right to control," not just FAS's exercise of control. ER133-34. The District Court "emphasized that it was critical that (i) some vendors negotiate and/or bid for their contracts with FAS, (ii) some vendors hire, manage, and pay their own workers, (iii) and some vendors are not 'substantially dependent on FAS for their revenue.'" ER134; *see also* ER161-65. Furthermore, "several of the secondary factors would require individualized inquiries." ER134.

The "new proposed class definition sufficiently cures these deficiencies," the District Court continued. *Id.* But FAS has explained why the definition's 70-percent threshold did not "cure" anything. The threshold: (i) has nothing to do with negotiations or bidding, ample evidence of which remains across the as-defined class, including as it concerns the "typical" named plaintiff; (ii) does not eliminate from the class vendors that "hire, manage, and pay their own workers," *id.*; and

(iii) does not prove "dependency" because it says nothing about each relationship's duration or vendors' preferences. FAS Br. at 64-65.

"Size also matters," the District Court explained in originally denying class certification. ER165. After all, "it is not obvious that vendors with a significant number of employees, none of whom are hired, managed or paid by FAS, are in the same position as an individual vendor who is wholly dependent on FAS for her income." *Id.* This, too, is not accounted for by the 70-percent threshold.

To this, Claimants remain mute. They neither defend the District Court's stated justification for certification nor candidly acknowledge its initial refusal to certify a class. Claimants nod at the definitional change, Claimants' Br. at 59, but never respond to FAS's counterpoints that the 70-percent threshold cannot eliminate individualized issues or prove "dependency," as the District Court hoped. Claimants merely state that the threshold does not *create* additional individualized issues, even though whether any vendor worked more than 70 percent of their time for FAS will itself be a contested question. *Id.* (Claimants note there is "a fixed class list of 156 class members," *id.*, but whether a class member is properly on the list remains subject to individualized proof.)

FAS's "true argument," Claimants continue, is "that *no* misclassification case can be certified," period. *Id.* at 56. That is not FAS's argument at all. FAS's "true argument" is only what the District Court originally determined, *i.e.*, that "individualized questions regarding FAS's right to control predominated over common ones." ER133. *Contra* Claimants, many courts have denied certification of misclassification claims for similar reasons. FAS Br. at 62-63 (collecting cases); *see also Narayan v. EGL, Inc.*, 285 F.R.D. 473, 478-80 (N.D. Cal. 2012). Because the 70-percent threshold cannot "cure" the "deficiencies" with the predominance criterion, the District Court had it right the first time. It never should have certified a class.

The same analysis applies all the more to class certification under *Dynamex*'s "C" factor. As discussed above, class members varied in the degree to which they established and operated independent businesses. Some were highly entrepreneurial. Many existed before and/or after relationships with FAS. Many invested heavily in themselves and their brand. All worked for FAS to differing degrees, for differing lengths of time. FAS Br. at 11-15. And, although in Claimants' view FAS "requires" vendors to obtain "licenses, EINs and insurance," Claimants'

Br. at 54, it is immaterial if FAS supposedly compelled vendors to operate independently. What matters is that they actually did so.

## B. No Common Evidence Exists To Prove Overtime Hours Worked Or Reimbursable Expenses Incurred.

Class certification is improper for another reason applicable to *all* of the *Borello* and *Dynamex* factors, including *Dynamex*'s "B" factor. It is undisputed that, to establish the number of overtime hours worked or businesses expenses incurred, at a class trial, each class member must present individualized testimony. All of this testimony will be subject to witness-by-witness credibility determinations. Little, if any, of the testimony will be corroborated by documentary evidence. None of it will be corroborated by samples, surveys, statistics, or expert evidence. *Compare Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1046-47 (2016) (allowing class certification only because of reliable expert-based "representative evidence" of hours worked) *with* Claimants' Br. at 62 (relying on *Tyson Foods* while acknowledging "proceedings that now require individualized testimony"). Amounts claimed will vary greatly too, ranging from fairly small awards to awards well into six figures.

Determining the necessity and reasonableness of the variety of expenses incurred, as well as overtime hours worked for FAS (versus

other clients), will thus involve qualitative and quantitative analyses, not straightforward calculations. Claimants do not deny – nor could they – that *none* of this can be measured using a common methodology.

Relying on decisions like *Leyva v. Medline Industries Inc.*, 716 F.3d 510 (9th Cir. 2013), Claimants counter that, "in this Circuit," questions of "individualized damages do not defeat certification." Claimant's Br. at 60. The Court, however, has only "applied this understanding in cases where there existed a common methodology for calculating damages," *viz.*, where "'damages could feasibly and efficiently be calculated once the common liability questions are adjudicated.'" *Doyle v. Chrysler Group, LLC*, 663 F.App'x 576, 579 (9th Cir. 2016) (quoting and distinguishing *Leyva*, 716 F.3d at 514). Class certification is improper where wage- or expense-related damages cannot be "feasibly and efficiently" calculated. *See, e.g.*, *Swamy v. Title Source, Inc.*, No. 17-1175, 2018 WL 1586139, at *6-7 (N.D. Cal. Apr. 2, 2018) (also distinguishing *Leyva*); *Harris v. Vector Mkt'g Corp.*, 753 F.Supp.2d 996, 1022-23 (N.D. Cal. 2010); *Norris-Wilson v. Delta-T Group, Inc.*, 270 F.R.D. 596, 610 (S.D. Cal. 2010); *Morgan v. Wet Seal, Inc.*, 210 Cal.App.4th 1341, 1355-69 (2012).

Claimants fail to distinguish these cases. They assert that *Norris-Wilson* "involved the lack of uniform policies regarding overtime and expenses," Claimants' Br. at 63, ignoring that *Norris-Wilson* also was a misclassification case, so the employer there had a "policy" of reimbursing no expenses. 270 F.R.D. at 605. *Norris-Wilson* involved a variety of expenses not "common to the entire putative class." *Id.* at 610. Class members here likewise seek a variety of expenses like tools and equipment, the composition of which will not be common to the class. Worse, vendors' expenses are not solely attributable to work for FAS, as opposed to work for vendors' other clients.

Claimants assert that *Harris* and *Morgan* are "inapposite" because "they did not involve claims that were, as here, governed by a uniform no-reimbursement policy and narrowed to specific categories of expenses tied to Workers' work for FAS." Claimants' Br. at 63. Claimants are dead-wrong about these cases not involving "a uniform no-reimbursement policy." *Harris* explicitly assumed the defendant "had a uniform policy or practice of not reimbursing for any expenses," 753 F.Supp.2d at 1022, while in *Morgan* the defendant "enforce[d] a companywide dress code policy," 210 Cal.App.4th at 1355, and, "as a

matter of practice," failed to reimburse travel expenses, *id.* at 1357, both in violation of § 2802.

*Contra* Claimants, the expenses in *Morgan* were narrowed to specific categories – branded clothing and mileage/fuel, *id.* at 1356-57 – exclusively tied to work for the defendant. And in *Harris*, as here, the class failed to show "that evaluation under § 2802 of the 'necessity' of various expenses incurred in a variety of contexts" – like "tools and expenses" here – "may be done on a relatively uniform basis." 753 F.Supp.2d at 1022. There also was "substantial variance as to what kind of expenses were even incurred by [class members] in the first place," *e.g.*, "cell phones." *Id.* Claimants' attempts to defend class certification thus fail across the board.

## III. Expenses Incurred By A Claimant's Business, Not The Claimant Personally, Are Not Recoverable.

The text of § 2802 – which twice refers to "his or her" – shows that it applies only to natural persons. It makes no sense to award § 2802 damages to the five Claimants who did not personally fund business expenses, which were instead funded by separately-incorporated, non-"employee" businesses that claimed the expenses for tax write-downs. Claimants cite no authority supporting their position. None exists. *See*

*Bowman v. CMG Mortg. Inc.*, No. 07-3140, 2008 WL 3200662, at *4 (N.D. Cal. Aug. 4, 2008) ("Plaintiffs do not cite any authority supporting their contention that an individual who personally funds a corporation which pays expenses on behalf of the individual's employer is entitled to be reimbursed as an employee under Labor Code § 2802(a).").

Claimants hope to cloud the issue. They argue that, to establish § 2802 liability, they need not show "that the employee also *pay[s]* for the expense incurred." Claimants' Br. at 63. Claimants selectively quote *Cochran v. Schwan's Home Service, Inc.*, 228 Cal.App.4th 1137 (2014). Ruling on class certification, *Cochran* stated that "[i]f an employee is required to make work-related calls on a personal cell phone, then he or she is incurring an expense," irrespective of "whether the phone bill is paid for by a third person, or at all." *Id.* at 1144. "To show liability under section 2802, an employee need only show that he or she was required to use a personal cell phone to make work-related calls, and he or she was not reimbursed." *Id.* at 1145.

FAS has no quarrel with this general proposition. It says nothing, however, about whether expense-related damages should be awarded to unharmed individuals. "*Damages, of course, raise issues that are more*

*complicated*" than liability, *Cochran* clarified. *Id.* (emphasis added).
After all, § 2802 damages cannot be awarded to uninjured plaintiffs. *Cf.*
*Espejo v. The Copley Press, Inc.*, 13 Cal.App.5th 329, 369 (2017) (§ 2802
awards "cannot properly include specific quantifiable charges and
expenses that the defendant credited back or otherwise reimbursed to
the plaintiff"). Indeed, "Article III does not give federal courts the
power to order relief to any uninjured plaintiff, class action or not."
*Tyson Foods*, 136 S.Ct. at 1053 (Roberts, C.J., concurring).[5]

Nor can the record be distorted to reflect that the five Claimants
personally paid the expenses. Consider the Gowans. Claimants argue
that "John Gowan testified that when he worked for FAS, he worked
through Pacific Shores Construction, which was a sole proprietorship
under his Social Security number, which Amy Gowan confirmed."
Claimants' Br. at 67. But Pacific Shores Construction and
Maintenance, Inc. was incorporated by 2009, ER63; ER229-30, and the
Gowans were only awarded expense-related damages for the period
covering January 2009 and after. ER40-43. The Pacific Shores tax

---

[5] Claimants also assert that FAS "requir[ed]" them "to create business
entities to pay their expenses." Claimants' Br. at 66. Even if this were
relevant to whether Claimants were injured, it is belied by the fact that
only five of the ten Claimants' businesses paid expenses in this manner.

records introduced at trial were for that period. ER 226-228. These records were filed in the corporation's name and, as the Gowans testified, "reflected expenses incurred by that corporation." ER229; *see also* ER63.

The same holds true for Cohick, Yager, and Bess, who worked for FAS during years in which their preservation businesses were incorporated, and whose claimed expenses were as reflected on their businesses' tax records. The jury did not find that these Claimants personally incurred expenses. Rather, over FAS's objections, the District Court allowed the jury to award damages in amounts consistent with the businesses' tax records. It is disingenuous for these Claimants to represent that *they* incurred expenses when their own documentary evidence and trial testimony was to the contrary.

## CONCLUSION

The judgment in the Claimants' favor should be reversed or vacated, and the class certification should be vacated.

Dated: April 19, 2019      Respectfully submitted,

*/s/ Frank G. Burt*

Frank G. Burt

*Attorney for Defendants-Appellants*
*Field Asset Services, Inc. and*
*Field Asset Services, LLC*

## CERTIFICATE OF COMPLIANCE
## FOR CASE NO. 18-16303

I certify that this brief complies with the type-volume limits permitted by Ninth Circuit Rule 32-1(b). The brief is 7,000 words, excluding the portions exempted by Ninth Circuit Rule 32-1(c) and Fed.R.App.P. 32(f). The brief's type-size and typeface comply with Fed.R.App.P. 32(a)(5) and (6).

*/s/ Frank G. Burt*
Frank G. Burt

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 19, 2019. I certify that all participants in the case who are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Frank G. Burt*
Frank G. Burt